**BROWN GROUP, INC.,**
**Plaintiff–Appellant,**

v.

**GEORGE F. BROWN & SONS, INC.,**
**Defendant–Respondent.**

No. 72035.

Missouri Court of Appeals,
Eastern District,
Division Four.

Dec. 9, 1997.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 4, 1998.

Application to Transfer Denied April 21, 1998.

Stefan J. Glynias, Adrain P. Sulser, Dean A. Stark, St. Louis, for plaintiff-appellant.

Rodney M. Sharp, Mary Anne Mellow, Kenneth J. Brennan, St. Louis, for defendant-respondent.

ROBERT G. DOWD, Jr., Presiding Judge.

Brown Group, Inc. ("Brown") appeals from the trial court's grant of summary judgment in favor of George F. Brown & Sons, Inc. ("Broker"). Brown argues the court erred because its environmental closure costs are damages imposed by law, and thus are recoverable under the policy sold by Broker and underwritten by Lloyd's, London ("Lloyd's"). We reverse and remand.

When considering appeals from summary judgments, the court will review the record in the light most favorable to the party against whom summary judgment was entered. *ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.,* 854 S.W.2d 371, 376 (Mo.1993). Our review is essentially de novo. *Id.*

In 1886, Moench Tanning Company was founded in Gowanda, New York. Brown later purchased the leather tannery facility in 1925. The tannery operation produced wastes which were dumped in a creek and on property behind the tannery, later known as the Palmer Street Landfill. Brown deposited waste in the landfill from approximately 1925 to 1983. In 1984, the U.S. Environmental Agency ("EPA") and New York State Department of Environmental Conservation ("NYSDEC") informed Brown the Palmer Landfill would have to be closed pursuant to federal laws and regulations, including Resources Conservation and Recovery Act, 42 U.S.C., sections 9601 *et seq.* Therefore in 1985, Brown applied to close the landfill pursuant to 6 NYCCR Part 373. The NYSDEC and Brown negotiated extensively in regard to closure of the landfill. In a letter dated March 31, 1989, Brown notified Broker of its claim against Lloyd's, based on its receipt of a letter dated February 6, 1997, from the NYSDEC requiring the installation of a full RCRA cap on the landfill and groundwater monitoring systems. Brown's claim was made under policy number MJ631015CB, which became effective June 1, 1953.

Brown estimated costs at two million, six hundred thousand dollars ($2,600,000). Since the March 31 estimate, the actual amount Brown has or will be required to spend to cover the environmental response costs is in excess of four million dollars ($4,000,000). Broker declined coverage. Neither party can find the list of specific Lloyd's underwriters. On September 19, 1992, Brown filed suit against Lloyd's et al., alleging property damage under policies underwritten by Lloyd's, and sold by Broker. Both sides filed motions for summary judgment. On January 1, 1997, the court granted summary

judgment in favor of Broker. This appeal followed.[1]

Both parties rely on *Farmland Industries, Inc. v. Republic Ins. Co.*, 941 S.W.2d 505 (Mo.1997). In *Farmland*, insured asked for a declaratory judgment regarding whether its comprehensive general liability, umbrella, and excess liability insurers were liable for environmental response costs required by the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"). *Id.* at 506. Costs incurred in the response to environmental harm, either removal or remedial action, are commonly called environmental response costs. *Id.* at 506–507. CERCLA and "analogous state statutes impose liability on ... companies who own or operate, or formerly owned or operated, facilities from which hazardous substances have been released." *Id.* at 506. The issue of whether the environmental response costs incurred pursuant to CERCLA and similar state laws were damages within the meaning of the policies issued to *Farmland*, was one of first impression. *Id.* at 508. First, the *Farmland* court applied settled Missouri law to interpret the language of the insurance policies. *Id.* at 508. The policies at issue were identical or similar to: "The company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of ... property damage...." *Id.* at 507. The court found the environmental response costs to be damages within the ordinary meaning of the term. *Id.* at 508.

In this case, Brown asserts that under the Certificate of Insurance underwritten by Lloyd's and issued by Broker costs associated with environmental response to NYSDEC's cleanup order are damages imposed by law. The language of the certificate at issue follows in pertinent part:

> The Underwriters hereby agree to pay all sums which the assured shall become liable to pay as damages imposed by law for damage to or the destruction of property

of every description caused during the period of this policy solely and directly by an accident occurring within or upon the premises described in this policy.

The trial court found:

> Response and "remediation" costs incurred by the insured under direct government compulsion to clean up waste site are not and cannot be "damages" as that term is commonly understood. Plaintiff is not being compelled to compensate any third person for a loss or injury sustained. Rather, plaintiff is being compelled by regulatory authorities to remedy an illegal condition.[2]

■ The trial court's finding is in conflict with the holding of the Missouri Supreme Court in *Farmland*.[3] The *Farmland* court found that response costs incurred pursuant to CERCLA and similar state laws are damages under the *Farmland* policies. *Id.* A review of the Lloyd's insurance certificate reveals that it covers damages that insured is legally required to pay because of property damage. Such language is essentially similar to the *Farmland* language. Therefore, under *Farmland*, Brown's environmental response costs are damages covered under the insurance. We reverse and remand.

In part one of its response to Brown's sole point on appeal, Broker distinguishes Brown's reliance on *Farmland* by asserting that *Farmland* is limited to cases in which the EPA or an analogous state agency, such as NYSDEC, does the remediation, or obtains injunctive relief, or enters into a consent agreement with the offending party. Broker alleges Brown voluntarily cleaned up the Palmer Landfill to comply with federal and state regulations, according to Brown's own admission in its brief. Therefore, it concludes Brown "never received an Order to remediate and was subject to no government compulsion whatsoever. Rather, Brown incurred clean up costs voluntarily. As such, it did not incur 'damages imposed by law.'"

---

1. Pursuant to Rule 74.01(b) the court found the Order and Judgment granting Broker's Motion for Summary Judgment to be final, and expressly determined there was no just reason for delay.

2. The trial court relied on *Cooper Industries v. American Mutual Liability Ins. Co.*, 22 Cir. No.864–00284 (Mo.Cir.Ct.1989).

3. We note the trial court's summary judgment was entered two months prior to *Farmland*.

However, a review of Brown's brief reveals the following in regard to whether the clean-up was voluntarily undertaken:

> Brown Group ... undertook voluntary site investigation when it first became aware that its property may be contaminated. However, early in the process, it was made clear to Brown Group that if it did not undertake investigatory and remedial action that the state would step in, close the landfill, and then pursue the costs for said closure from Brown Group.... Brown Group voluntarily agreed to abide by NYSDEC's requirements, closed the Palmer Street landfill in accordance with NYSDEC's closure letter of February 6, 1989, and avoided the need for the state to initiate an action under appropriate state laws.

First, *Farmland* does state that under CERCLA, the EPA may require the responsible party to pay through one of the following means: (1) the EPA may conduct removal and remedial work, and then sue the responsible parties; (2) the EPA may seek injunctive relief to require the responsible parties to abate the danger of or the threatened release of a hazardous substance; or (3) the EPA may enter into an agreement with the responsible parties to respond to environmental harm. *Id.* at 507. Pursuant to CERCLA, the agreement must be approved by the Attorney General and entered as a consent decree in the appropriate United States District Court. *Id.* However, *Farmland* does not hold that such action by the EPA is required before response costs are included in damages. *Farmland* specifically recognizes both CERCLA and "similar state laws," under which environmental response costs could be incurred. If "similar state law" controls, as it does here, a state agency, such as NYSDEC, rather than the EPA, would control. The holding in *Farmland* is not limited exclusively to cleanup under CERCLA and EPA.

Finally, Brown voluntarily undertook site inspection and then voluntarily complied with NYSDEC's requirements, rather than force the state to sue for compliance or remediation costs. We do not find such action contrary to *Farmland's* finding that environmental response costs, as required by law, are damages within the ordinary meaning of the term.

■ In part two of its response to Brown's sole point on appeal, Broker argues that the dumping in the landfill was not an accident, and thus was not covered under the certificate. The trial court did not address this issue. Broker argues that Brown intentionally dumped the tannery waste, and thus, the resultant property damage was no accident. Broker concedes that Brown contends "it had no knowledge of the hazardous composition of the waste." What Brown intended or expected as a result of the dumping of the waste is a question of fact for the fact finder. *American Family Mut. Ins. Co. v. Pacchetti*, 808 S.W.2d 369, 371 (Mo.1991); *Steelman v. Holford*, 765 S.W.2d 372, 377 (Mo.App.1989). Therefore, whether the damage resulted from an accident will not be considered on appeal.

■ In part three of its response to Brown's sole point on appeal, Broker argues that Brown is excluded from coverage because it owned the property at all relevant times, precluding it from coverage under the certificate's property exclusion. Broker relies on a quotation from the certificate, as follows: "This Policy shall not cover damage to or destruction of any property: (a) if owned, leased, occupied or used by, or in the care, custody or control of, the insured or any employees of the insured." However, in deciding against Broker, the court referred to the pertinent text of the certificate as follows:

> This Policy shall not cover damage to or destruction of any property:
>
> (a) If owned, leased, occupied or used by, or in the care, custody or control of, the Assured or any employees of the Assured:
>
> (b) If such damage or destruction is due to: the explosion, collapse or rupture of any boiler or other receptacle under pressure. Including parts thereof: the breaking, disrupting or tearing asunder of any engine, flywheel or turbine, . . .

(c) Such as wires, conduits, pipes, severs, or any apparatus in connection therewith . . .

(d) If such damage or destruction is due to the ownership, maintenance or use of any watercraft;

(e) If such damage or destruction is due to the collapse of, or structural injury to, any building or structure adjacent to the insured premises upon which the work. . . .

The court found that if section (a) were read in isolation, pursuant to Broker's argument, "it would render the exclusions which follow it superfluous and meaningless. In addition, the colon following section (a), read together with the semicolons that follow exclusions (b) through (e), suggests that the drafter intended (b) through (e) to modify and limit section (a)."

Furthermore, the court found that: (1) contracts must be construed as a whole, *Parker v. Pulitzer Pub. Co.*, 882 S.W.2d 245, 249 (Mo.App. E.D.1994); (2) section (a), read in isolation, supports Broker's argument, but when read in context, the meaning is otherwise, *Haggard Hauling & Rigging Co., Inc. v. Stonewall Ins. Co.*, 852 S.W.2d 396, 399 (Mo.App. W.D.1993); (3) provisions taken as a whole express the intent of the parties better than isolated provisions lifted out of context, *Buffalow v. Bull*, 619 S.W.2d 913, 922, (Mo.App.1981); and (4) the application of Broker's argument would have the repugnant result of affording no coverage to Brown, *Allison v. National Ins. Underwriters*, 487 S.W.2d 257, 263 (Mo.App.1972). The court denied Broker's argument based on the alleged property exclusion. We agree.

■ In part four of its response to Brown's sole point on appeal, Broker argues that Brown is excluded from coverage because it failed to file notice and the sworn proof of loss as required by the certificate. In its order, the trial court addressed Broker's claim that Brown's notification, on March 31, 1989, was five years after the EPA notified Brown the landfill had to be closed pursuant to EPA regulations, and was not within 60 days of capping the landfill. The

court found Broker's contentions are misplaced as it chose "arbitrary events by which to measure the time limit in which [Brown] was required to provide notice and proof of loss." Furthermore, it found "the 'date of loss' was not ascertainable until [Brown] was able to come up with sum certain estimates of the expenses it would incur in order to comply with the EPA's and NYSDEC's orders." The court found that March 31, 1989, was well before Brown's cognizance of the extent of its damages, because NYSDEC was still evaluating Brown's closure plans. On March 31, 1989, Brown had estimated damages at two million, six hundred thousand dollars ($2,600,000), but that premature estimate "later rose to approximately $4 million for settlement of NYSDEC's claim by September 6, 1989." Finally, the court found Brown presented sufficient evidence it met the certificate requirements with regard to notice and found Broker's point to be without merit. We agree.

In addition, a review of the record reveals Broker arbitrarily ignored the significance of NYSDEC's February 6, 1989, letter requiring Brown to timely submit and implement a revised closure plan under 6 NYCRR Part 373, followed by Brown's notice to Broker within sixty days. Finally, Broker fails to support its arbitrary choice of dates it deems "dates of loss."

■ The court further found that: (1) even if notice was untimely, Broker would not be exonerated from liability absent proof it was prejudiced by such untimely notice, *Pannell v. Missouri Ins. Guaranty Ass'n.*, 595 S.W.2d 339, 348 (Mo.App. W.D.1980); and (2) whether the insurer had been prejudiced by the insured is a question of fact for the trier of fact. *Tresner v. State Farm Ins. Co.*, 913 S.W.2d 7, 15 (Mo.1995); *Weaver v. State Farm Mut. Auto. Ins. Co.*, 936 S.W.2d 818, 821 (Mo.1997). We agree. Furthermore, the record indicates Broker made no effort to participate in the planning and implementation of the site closure following Brown's notice dated March 31, 1989. Yet the closure plan was not finalized until September 1989, and closure was not completed until 1991. Therefore, Broker has concluded

it was prejudiced but has failed to submit facts sufficient to prove it was prejudiced.

The judgment of the trial court is reversed. The case is remanded for further proceedings consistent with this opinion.

SIMON and HOFF, JJ., concur.