ATTORNEYS FOR APPELLANTS
George M. Plews
Donna C. Marron
John M. Ketcham
Plews Shadley Racher & Braun
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE AND OTHER PLAINTIFFS
Richard A. Smikle
Brian J. Paul
Ice Miller LLP
Indianapolis, Indiana

Howard B. Epstein
Theodore A. Keyes
Sami B. Groff
Schulte Roth & Zabel LLP
New York, New York

## In the
## Indiana Supreme Court

No. 32S05-0604-CV-00151

CINERGY CORPORATION, DUKE ENERGY INDIANA, INC. AND DUKE ENERGY OHIO, INC.,[1]

*Appellants (Defendants),*

v.

ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES, LTD.,    *Appellee (Plaintiff),*

ST. PAUL SURPLUS LINES INSURANCE COMPANY; AETNA CASUALTY & SURETY COMPANY; ALLIANZ UNDERWRITERS INSURANCE COMPANY.; AMERICAN NATIONAL FIRE INSURANCE COMPANY; CALIFORNIA UNION INSURANCE COMPANY; EMPLOYERS MUTUAL INSURANCE COMPANY; FIRST STATE INSURANCE COMPANY; GREAT AMERICAN INSURANCE COMPANY; HARBOR INSURANCE COMPANY; HIGHLANDS INSURANCE COMPANY; INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA; INTERNATIONAL INSURANCE COMPANY; INTERNATIONAL SURPLUS LINES INSURANCE COMPANY; LEXINGTON INSURANCE COMPANY; NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA; REPUBLIC INSURANCE COMPANY; ROYAL INDEMNITY COMPANY; SAFETY MUTUAL CASUALTY COMPANY; TRANSAMERICA PREMIER UNDERWRITERS AT LLOYD'S LONDON,

*(Additional Plaintiffs).* [2]

Interlocutory Appeal from the Hendricks Superior Court, No. 32D02-0010-CP-191
The Honorable David H. Coleman, Judge

---

[1] The defendants originally named in this case were Cinergy Corporation, PSI Energy, Incorporated, and Cincinnati Gas & Electric Company. The defendants subsequently filed a Notice of Name Change advising that PSI Energy, Incorporated, is now Duke Energy Indiana, Inc., and Cincinnati Gas & Electric Company is now Duke Energy Ohio, Inc.

[2] This appeal challenges the denial of the defendants' motion seeking partial summary judgment against only one of the plaintiffs, Associated Electric & Gas Insurance Services, LTD. Pursuant to Indiana Appellate Rule 17(A), however, a party of record in the trial court is a party on appeal.

_____

**May 1, 2007**

**Dickson, Justice.**

Incurring enormous defense costs in the course of a federal environmental lawsuit, several power companies desire payment of these defense costs, as they are incurred, under the terms of certain liability insurance policies. The insurance companies, denying liability for such defense costs, initiated this action for declaratory judgment. The power companies sought partial summary judgment to compel payment of all past and future defense costs incurred in responding to the federal lawsuit. We affirm the trial court's denial of the motion because it seeks relief more extensive than that to which the power companies are entitled.

Associated Electric & Gas Insurance Services Limited ("AEGIS"), and twenty-two other insurance entities filed a complaint for declaratory judgment against Cinergy Corporation, PSI Energy, Incorporated (now Duke Energy Indiana, Inc.), and Cincinnati Gas & Electric Company (now Duke Energy Ohio, Inc.), power companies insured under policy contracts issued by the plaintiffs. The complaint seeks to determine the extent of the plaintiffs' insurance obligations with respect to a federal lawsuit filed against the power companies by the United States, three states, and several environmental organizations pursuant to the federal Clean Air Act alleging failure to obtain permits and discharge of excess emissions from power plants resulting in widespread harm to public health and the environment. The power companies filed a motion for partial summary judgment seeking from one of the plaintiffs, AEGIS, over four million dollars in defense costs (exceeding the self-insured retention amount[3]) incurred in the federal lawsuit, prejudgment interest, and an order directing AEGIS to pay, as incurred, all of the power companies' future defense costs in defending the federal lawsuit. The trial court denied the power companies' motion, but certified it for interlocutory appeal.[4] The Court of Appeals accepted the inter-

_____

[3] The policies provide excess coverage over the self-insured retentions of $500,000 for two of the policies and $1,000,000 for one of the policies. Appellees' Br. at 2-3.

[4] During the trial court proceedings, at the request of the power companies, the trial court issued an order declaring certain documents to be confidential and not disclosed to the public. In this appeal, however,

locutory appeal and affirmed the trial court's denial of partial summary judgment. Cinergy Corp. v. St. Paul Surplus Lines Ins. Co., 838 N.E.2d 1104 (Ind. Ct. App. 2005). The federal lawsuit is ongoing.[5] We granted transfer.

On interlocutory appeal, the power companies contend there are no determinative issues of material fact and that, as a matter of law, the policy provisions require AEGIS to pay the power companies' costs for defense of the federal lawsuit, and to pay such defense costs as they are incurred by the power companies. AEGIS contends that its policies provide no coverage for the claims made against the power companies in the federal suit, and thus it has no duty to pay defense costs. It also contends, in the alternative, that any such defense costs are not payable as incurred but rather only when "the loss occurs and is determined to be covered." Appellees' Br. at 9.

A party seeking appellate reversal of the denial of summary judgment must demonstrate that "the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C); *see also* Gunkel v. Renovations, Inc., 822 N.E.2d 150, 152 (Ind. 2005); Worman Enter., Inc. v. Boone County Solid Waste Mgmt. Dist., 805 N.E.2d 369, 373 (Ind. 2004). In ruling on a motion for summary judgment, a court may grant such judgment for any other party upon any issues raised by the motion. T.R. 56(B). Generally, the interpretation of an insurance policy presents a question of law and is thus appropriate for summary judgment. Colonial Penn Ins. Co. v. Guzorek, 690 N.E.2d 664, 667 (Ind. 1997). If summary judgment turns on the interpretation of a written document, any ambiguity that arises must be resolvable without the aid of the fact-finder.

_____

the power companies filed as a public record in the office of the Supreme Court Clerk the appendix, appellants' brief, appellants' reply brief, petition to transfer, and amended reply brief in support of petition to transfer, all without any designation or request for confidentiality. This opinion does not discuss any facts not contained in such public submissions.

[5] The litigation has included an interlocutory appeal of the federal trial court's grant of the government's motion for partial summary judgment regarding the "purely legal question of what is the appropriate method of determining whether a physical change at a source has caused an increase in emissions for purposes of [New Source Review under the Clean Air Act]." United States v. Cinergy Corp., 384 F.Supp.2d 1272, 1274 (S.D. Ind. 2005), *aff'd*, 458 F.3d 705 (7th Cir. 2006), *cert. denied*, No. 06-8 50 (U.S. Apr. 16, 2007), http://www.supremecourtus.gov/orders/courtorders/041607pzor.pdf.

finder. <u>Plumlee v. Monroe Guar. Ins. Co.</u>, 655 N.E.2d 350, 354 (Ind. Ct. App. 1995), *trans. denied*; <u>Kutche Chevrolet-Oldsmobile-Pontiac-Buick, Inc. v. Anderson Banking Co.</u>, 597 N.E.2d 1307, 1309 (Ind. Ct. App. 1992), *trans. not sought*. Clear and unambiguous language in insurance policy contracts, like other contracts, should be given its plain and ordinary meaning. <u>Allstate Ins. Co. v. Dana Corp.</u>, 759 N.E.2d 1049, 1054 (Ind. 2001). But where the policy language is ambiguous, insurance contracts are to be construed strictly against the insurer and the language must be viewed from the standpoint of the insured. *Id*. at 1056. Thus, ambiguous terms will be construed in favor of the insured, but for purposes of summary judgment, only if the ambiguity exists by reason of the language used and not because of extrinsic facts. *See* <u>McCae Mgmt. Corp. v. Merchants Nat'l Bank</u>, 553 N.E.2d 884, 887 (Ind. Ct. App. 1990), *trans. denied*.

AEGIS issued to each defendant a substantially similar "Excess Liability Insurance Policy" wherein AEGIS agreed to indemnify the respective insured power company:

> for any and all sums which the INSURED shall become legally obligated to pay as ULTIMATE NET LOSS by reason of the liability imposed upon the INSURED by law or liability assumed by the INSURED under CONTRACT, including the INSURED'S proportionate share of any liability arising in any manner whatsoever out of the operations or existence of any JOINT VENTURE in which the INSURED has an interest, for damages because of BODILY INJURY . . . or PROPERTY DAMAGE caused by an OCCURRENCE.

Appellants' App'x. at 382, 409, 442.[6]

The term "ultimate net loss" is defined in the 1984-85 policies issued to PSI Incorporated and the Cincinnati Gas & Electric Company to mean, in relevant part:

> the total of the following sums with respect to each OCCURRENCE or WRONGFUL ACT to which this POLICY applies;
> (1) all sums which the INSURED shall become legally obligated to pay as damages either by adjudication or compromise with the consent of the COMPANY, after making proper deductions for all recoveries and salvages collectible and for other insurance that is in excess of the UNDERLYING LIMITS; and
> (2) all expenses incurred by the INSURED in the investigation, negotiation, settlement and defense of any claim or suit seeking such damages, excluding all salaries of employees and office expense of the INSURED.

---

[6] Words and phrases in all capital letters "have special meanings set forth" in the Definitions section of each policy. Appellants' App'x. at 442.

*Id*. at 387, 414.

In the 1999-2000 policy issued to Cinergy Corp., "ultimate net loss" is merely defined to mean "the total INDEMNITY and DEFENSE COSTS with respect to each OCCURRENCE to which this POLICY applies." *Id*. at 448. The policy also provides the following definitions for "indemnity" and "defense costs," in relevant part:

> The term "INDEMNITY" shall mean all sums which the INSURED shall become legally obligated to pay as damages, including punitive damages where permitted by law, either by adjudication or compromise with the consent of the COMPANY, after making proper deductions for all recoveries and salvages collectible . . . .
>
> The term "DEFENSE COSTS" shall mean all expenses incurred by the INSURED in the investigation, negotiation, settlement and defense of any CLAIM or in the investigation of any OCCURRENCE or circumstances of which NOTICE OF CIRCUMSTANCES has been given, excluding all salaries, wages and benefit expenses of employees and office expenses of the INSURED; . . . .

*Id*. at 445.

The 1999-2000 AEGIS insurance policy issued to Cinergy Corp. defines "claim" to mean "any demand or suit against any INSURED for damages because of BODILY INJURY . . . or PROPERTY DAMAGE." *Id.* at 444. And it defines "occurrence" to mean, in relevant part: "with respect to BODILY INJURY and PROPERTY DAMAGE, an accident, event or continuous or repeated exposure to conditions neither expected nor intended from the standpoint of the INSURED." *Id.* at 447. The 1984-1985 AEGIS insurance policies issued to PSI Incorporated and to the Cincinnati Gas & Electric Company defines "occurrence" to mean, in relevant part:

> The term "OCCURRENCE" shall mean an accident, event or continuous or repeated exposure to conditions which result in BODILY INJURY . . . or PROPERTY DAMAGE, subject to the following clarifications:
> (1) all injury, damage or loss of use and all claims for injury, damage or loss of use arising out of the same accident, the same event or exposure to substantially the same general conditions shall be considered as arising out of and comprising a single OCCURRENCE.

*Id.* at 386, 413. All three insurance policies similarly define the term "bodily injury" to mean, in relevant part, "bodily injury, mental anguish, mental illness, emotional upset, sickness or disease sustained by any person . . . including death at any time resulting therefrom." *Id.* at 444, 384, 411. Likewise, "property damage" in each of the policies means, in relevant part, "physical [injury or damage] to or destruction of tangible property . . . including the loss of use thereof " if

5

caused by an occurrence to which the policy applies. *Id.* at 387, 414, 448.

Notwithstanding the language referring to defense costs as part of "ultimate net loss," none of the policies impose upon AEGIS a separate duty to defend. To the contrary, the policies expressly provide that AEGIS "shall not be called upon to assume charge of the settlement or defense" of any claim, suit, or proceeding. *Id*. at 392, 419, 452.

## 1. Coverage for Defense Costs

The power companies contend that the policy provisions require AEGIS to pay the power companies' costs for defense of the federal lawsuit. They argue that the obligation to pay defense costs is not limited just to such costs attributable to the defense of claims that actually result in a liability against the insured covered by the AEGIS policy, but rather "also the costs of defending against claims or suits 'seeking' to impose liability," that is, "defense costs for potentially covered claims." Appellants' Reply Br. at 1.

AEGIS responds that its policies require payment of defense costs only if the insured is "legally obligated to pay a judgment or settlement in the underlying action," Appellee's Br. at 8, and that it need not pay defense costs "unless and until the loss occurs and is determined to be covered (and the self-insured retention is exhausted)." *Id.* at 9. AEGIS argues that it has "no contractual requirement to pay defense costs for disputed claims." *Id.* In the alternative, AEGIS also asserts that the companies have failed to establish that the underlying claims in the federal lawsuit fall within their claim of "potentially covered."

The parties' dispute centers on the construction of the policy language that requires AEGIS to indemnify the respective power companies for sums the companies "become legally obligated to pay as ULTIMATE NET LOSS." Appellants' App'x. at 382, 409, 442. The claimed AEGIS liability for defense costs arises from the policies' definitions of "ultimate net loss." This is defined in the 1984-85 policies to specifically include, as to each occurrence to which the policy applies, "all expenses incurred . . . in the investigation, negotiation, settlement and defense of any claim or suit" seeking damages. *Id.* at 387, 414. In the 2000-2001 policy, "ultimate net loss"

6

is defined to include "defense costs," which is then separately defined to mean: "all expenses incurred . . . in the investigation, negotiation, settlement and defense" of any claim. *Id.* at 445.

Synthesizing the policies' insuring agreements with their respective definitions of capitalized words and phrases is a daunting task, replete with often confusing, redundant, and sometimes circular concepts. Mindful of our obligation to construe any ambiguities and confusing language strictly against the insurer, we conclude that, as to the issue of AEGIS's responsibility for the power companies' defense costs under the circumstances here presented, all three policies impose essentially the same obligation. After the self-insured retention amounts specified in the policies are satisfied, AEGIS is responsible for expenses incurred by the power companies in the investigation, negotiation, settlement, and defense of any claim or suit seeking damages because of or resulting in bodily injury or property damage with respect to any accident, event, or continuous or repeated exposure to conditions. The essential controversy is thus whether the federal lawsuit against the power companies is such a suit—one that seeks damages because of or resulting in bodily injury or property damage with respect to any accident, event, or continuous or repeated exposure to conditions. The power companies cannot succeed in their summary judgment motion if the resolution of this question depends upon disputed factual issues.

As an initial matter, with respect to AEGIS's claim that its responsibility for defense costs does not exist as to disputed claims and arises only when it becomes obligated to pay a judgment or settlement in the underlying action, we disagree. To the extent that AEGIS may have a responsibility with respect to defense costs, such obligation is independent of whether or not the plaintiffs in the federal lawsuit are ultimately successful in obtaining a judgment or settlement against the power companies. The language of each policy imposes upon AEGIS the separate responsibility for defense costs for claims or suits seeking damages for occurrences that result in bodily injury or property damage. The language common to the policies clearly distinguishes the AEGIS obligation to pay "all sums which the INSURED shall become legally obligated to pay as damages" from its obligation to pay "all expenses incurred by the INSURED" in the defense of claims to which the policy applies. *Id.* at 387, 414, 445. This obligation to pay defense costs exists regardless of whether the federal lawsuit eventually results in a judgment or settlement against the power companies.

7

To further resist the power companies' request for payment of their defense costs as incurred, AEGIS contends that its policies are only "indemnity," not "direct pay," contracts. Appellee's Br. at 21. And AEGIS also asserts that its obligations to the power companies apply only to the "'total' indemnity and defense costs," *id.* at 16, and that there is "no coverage" until the power companies can calculate the total of both the damages imposed by the federal lawsuit and the defense expenses eventually incurred in defending the lawsuit, *id.* at 17-18. Notwithstanding the initial AEGIS agreement "to indemnify"[7] and the policies' use of the word "total"[8] to refer to indemnity or the sums included in "ultimate net loss," the policies also expressly require AEGIS to pay for "*any* and all sums"[9] that the power companies become legally obligated to pay as "expenses incurred"[10] in the investigation, negotiation, settlement and defense of the federal lawsuit. The separate specification of "any" sums leads the policy reader to understand that AEGIS not only will pay "all" sums but also individual component sums that the power companies become obligated to pay as defense costs. Furthermore, the policy speaks of such costs that the power companies "become legally obligated to pay" and "as expenses incurred." There is no dispute that such defense costs are in fact incurred by the power companies as legal services are rendered and billed to them, at which point the companies become legally obligated to pay such costs. We find that an ambiguity thus arises and that the language must be construed to impose upon AEGIS the "direct pay" responsibility for covered defense costs as incurred by the power companies. Unresolved, however, is the extent of covered defense costs and whether the power companies are entitled to the relief sought in their motion for partial summary judgment.

The nature of the underlying federal lawsuit, as reflected by the record before us, is "a civil action" brought against the power companies "for injunctive relief and the assessment of civil penalties for violations" of various provisions of the Clean Air Act, federally-enforceable

---

[7] *Id.* at 382, 409, 442.

[8] *Id.* at 387, 414, 448.

[9] *Id.* at 382, 409, 442 (emphasis added).

[10] *Id.* at 387, 414, 445.

8

State Implementation Plans developed by Indiana and Ohio, and a 1998 administrative consent order. Appellants' App'x. at 227.

Following twenty-eight pages of introductory explanatory material and general allegations, the federal complaint presents sixteen separate detailed claims for relief, each consisting of numerous rhetorical paragraphs alleging specific violations and locations and asserting that each such violation subjects the power companies to injunctive relief and civil penalties. *Id.* at 241-252. The complaint concludes with a final section titled "Prayer for Relief," which we condense and summarize as requesting that the federal trial court take the following action:

(a) permanently enjoin the power companies from operating or constructing various power plants "except in accordance with the Clean Air Act and any applicable regulatory requirements" or the administrative consent order;

(b) order the power companies "to remedy their past violations by, *inter alia*, requiring the Defendants to install, as appropriate, the best available control technology, the best available technology, or technology to achieve the lowest achievable emissions rate on each boiler unit" at various power plants, and "to take such other measures as are necessary to bring the Defendants' plants into compliance" with provisions of the Act and the State Implementation Plans, "including emission offsets, if necessary," and to otherwise comply with the Act;

(c) order the power companies "to take other appropriate actions to remedy, mitigate, and offset the harm to public health and the environment caused by the violations of the Clean Air Act";

(d) order the power companies "to apply for permits that are in conformity" with requirements of the Act and the State Implementation Plans;

(e) order the power companies "to conduct audits of their operations to determine if any additional modifications have occurred which would require them to meet" various statutory and regulatory requirements;

(f) assess "a civil penalty . . . of up to $25,000 per day for each violation of the Clean Air Act and the applicable regulations, and $27,500 per day for each such violation on or after January 30, 1997";

(g) award costs of the action; and

9

(h) grant "such other relief as the Court deems just and proper."

*Id*. at 252-53.

The power companies argue that the federal lawsuit seeks "damages" within the meaning of the AEGIS policies. In both their trial court submissions in support of the motion for partial summary judgment, and in their briefs on appeal, the power companies emphasize language in the federal complaint that alleges that the companies' prior conduct has already caused extensive damage to human health and welfare, to the environment, and to historic buildings and monuments. *Id*. at 137, 141; Appellants Br. at 4-6. Primarily focusing upon the "Prayer for Relief" section of the federal complaint, the power companies argue that the federal lawsuit seeks to require them to "remedy, mitigate, and offset the harm to public health and the environment caused by the violations of the Clean Air Act" and further that the lawsuit thus seeks to impose upon the power companies "the cost of government mandated injunctive remedies to remediate or contain further environmental harm." *Id*. at 25-26. Citing several cases from Indiana and other states, the power companies assert that such compliance costs constitute "damages" covered by the AEGIS policies.

In response, AEGIS focuses upon the sixteen detailed claims for relief, not the final "Prayer for Relief" section, and contends that its insurance policies "simply do not provide coverage for any of the claims asserted" in the federal lawsuit. Appellee's Br. at 30. AEGIS describes the lawsuit as seeking "to force [the power companies] to comply with statutory requirements that it apply for certain permits before constructing projects at its facilities, and where necessary, install modern pollution control technology as part of the construction." *Id*. at 39-40. AEGIS argues that this is not the same as seeking compliance with statutory cleanup requirements nor seeking costs of containing currently leaking pollutants from spreading (as distinguished from keeping future emissions from being discharged). *Id.* at 40. AEGIS asserts that none of the separately enumerated sixteen claims for relief seek damages for bodily injury or property damage but rather only "seek injunctive relief in the form of modifications to [the power companies'] facilities including the replacement and installation of major components such as the superheater, economizer, wall tubes, coal bunker, waterwall tubing, high temperature reheater, condenser tubing, turbine blades, and other turbine equipment," which are "equipment

intended to reduce emissions of pollutants before they are emitted." *Id.* at 33.

There is essential agreement among the parties, however, that the primary thrust of the federal lawsuit is to require the power companies to incur the costs of installing government-mandated equipment intended to reduce future emissions of pollutants and prevent future environmental harm. Their principal disagreement is thus whether the costs of installing such equipment fall within the policies' coverage for damages because of or resulting in bodily injury or property damage with respect to any accident, event, or continuous or repeated exposure to conditions.

Prior Indiana appellate decisions have concluded that similar insurance policies provide coverage to insureds facing governmental environmental lawsuits. In Hartford Accident & Indem. Co. v. Dana Corp., 690 N.E.2d 285 (Ind. Ct. App. 1997), *trans. denied*, the court held that "the ordinary meaning of the term 'damages' in a [comprehensive general liability] policy includes EPA or state-mandated cleanup and response costs, and that the trial court properly so concluded." *Id.* at 298. The court expressly concluded "that the ordinary meaning of 'damages' is so broad that it encompasses . . . environmental response costs." *Id.* (quoting Farmland Indus., Inc., v. Republic Ins. Co., 941 S.W.2d 505, 511 (Mo. 1997)). Rejecting the insurer's claim "that preventive measures such as containment costs, where no environmental contamination has yet occurred, are not damages," the court stated that the "cost of containment as a remedial action taken to prevent further release of hazardous substances would be considered damages." Hartford v. Dana, 690 N.E.2d at 298.

A subsequent case, Travelers Indem. Co. v. Summit Corp., 715 N.E.2d 926 (Ind. Ct. App. 1999), *trans. not sought*, involved a coverage dispute under a comprehensive general liability policy for the costs of complying with an order by the Environmental Protection Agency and other environmental agencies directing the insured to clean up contaminants at various sites. Applying Hartford v. Dana, the court held that the undefined term "damages" in a comprehensive general liability insurance policy "includes environmental cleanup and response costs," and the word "suit" in the liability insurance policy "includes environmental administrative actions." *Id.* at 933-34.

11

Policy language in various liability insurance contracts has likewise been construed to require coverage for environmental cleanup in several other cases. *See, e.g.*, Allstate Ins. Co. v. Dana Corp., 759 N.E.2d 1049, 1056 (Ind. 2001) (policy exclusion for damage to insured's property held not to preclude coverage for contamination cleanup liability to third parties resulting from that damage); Am. States Ins. Co. v. Kiger, 662 N.E.2d 945, 947-49 (Ind. 1996) ("pollution exclusion" in garage liability insurance policy held not to exclude coverage for "sudden and accidental" discharges and for losses arising out of "discharge, dispersal, seepage, migration, release or escape of 'pollutants,'" including any liquid or gaseous irritant or contaminant); Seymour Mfg. Co. v . Commercial Union Ins. Co., 665 N.E.2d 891, 892 (Ind. 1996)) ("sudden and accidental" and "pollutant" in liability coverage policy construed against the insured in favor of coverage for EPA action to recover environmental cleanup and other costs); Great Lakes Chem. Corp. v. Int'l Surplus Lines Ins. Co., 638 N.E.2d 847, 851 (Ind. Ct. App. 1994) (construing "pollution exclusion" not to exclude coverage for damage actions brought by various persons and communities against the insured claiming soil and groundwater contamination), *trans. granted but Court of Appeals opinion reinstated by* 698 N.E.2d 1192 (Ind. 1998).

The power companies also refer to other jurisdictions in concluding that the term "damages" in comprehensive general liability policies includes preventive measures and compliance costs where defendants have allegedly violated environmental regulatory statutes resulting in property damage or bodily injury. Appellants' Br. at 27-28 (citing Lindsay Mfg. Co. v. Hartford Accident & Indem. Co., 118 F.3d 1263, 1271 (8th Cir. 1997); AIU Ins. Co. v. Superior Court, 274 Cal. Rptr. 820, 845, 799 P.2d 1253, 1278 (1990); A.Y. McDonald Indus. v. Ins. Co. of  N. Am., 475 N.W.2d 607, 611, 623 (Iowa 1991); Brown Group, Inc. v. George F. Brown & Sons, Inc., 963 S.W.2d 285, 288 (Mo. Ct. App. 1997)).

AEGIS disputes the applicability of Indiana precedent, asserting that none of the cases concern whether liability coverage for "'bodily injury' . . . or 'property damage' provides coverage for a claim seeking injunctive relief ordering a defendant to make modifications to its own facility and cease operating in violation of a statute." Appellee's Br. at 38. AEGIS also asserts that "none of the cases cited concern air pollution or violations of the PSD [Prevention of Significant

Deterioration] or NSR [New Source Review] provisions of the CAA [Clean Air Act]." *Id.* It argues that the cases dealing with emission of industrial waste all involved damage when the wastes settled on persons and properties, as opposed to emission in the air as alleged here. AEGIS distinguishes the federal claims in this case with cases where "damages" have included government-mandated cleanup costs, explaining that "[t]he claims here . . . do not allege cleanup costs or preventive measures ordered as part of the clean up of a spill," but rather "the underlying claims here seek to force [the power companies] to comply with statutory requirements that it apply for certain permits before constructing projects at its facilities, and where necessary, install modern pollution control technology as part of the construction." *Id*. at 39-40.

AEGIS urges that "damages" under its policies should not apply to "prophylactic measures taken to limit the release of emissions." *Id.* at 40. Citing AIU Ins. Co. and A.Y. McDonald Indus., two of the same cases cited by the power companies in support of their position, AEGIS argues that the expenses incurred under environmental injunctions that are prophylactic in nature to prevent future emissions should not be considered property damage and thus not covered.

In A.Y.McDonald Indus., a brass foundry dumped sand containing lead on the foundry site. Following a complaint by the EPA, an administrative hearing, and an appeal, the foundry and several government agencies entered into a consent order requiring the installation of a clay cap over specified land, expansion of a groundwater monitoring system, and implementation of a postclosure plan for thirty-years. The foundry's subsequent action for declaratory relief against several insurers was removed to federal court, which then certified to the Iowa Supreme Court questions regarding the construction of insurance policies and coverage for response costs and penalties. The court noted that "[n]early all" of the state appellate courts agree that "response or cleanup costs incurred under environmental protection statutes are indeed covered" by similar policies. A.Y.McDonald Indus, 475 N.W.2d at 615. After an extensive survey of state and federal authority, it held that "response costs for preventative measures employed after pollution has taken place are incurred 'because of property damage'" under the CGL policies. *Id*. at 624. But "costs incurred to pay for preventative measures taken in advance of pollution are not incurred 'because of property damage.'" *Id.*

13

A similar approach was followed in <u>AIU Ins. Co.</u>, which addressed the coverage provided under comprehensive general liability insurance policies for relief sought against the insured by lawsuits seeking injunctions compelling the termination of hazardous waste disposal, removal of contaminants already present, and reimbursement for costs of investigating, monitoring, and initiating hazardous waste cleanup. 51 Cal. 3d at 815-16, 799 P.2d at 1260. The court emphasized that these third-party suits "rest on allegations of past and present damage to land and water," and thus are "for remedial and mitigative actions" as distinguished from reimbursement for "prophylactic purposes." *Id.* at 832-33, 799 P.2d at 1272. Acknowledging that "prophylactic costs— incurred to pay for measures taken in advance of any release of hazardous waste—are not incurred 'because of property damage,'" *id.* at 843, 799 P.2d at 1279, the California Supreme Court held that the relief sought was not wholly prophylactic in nature, and thus the costs of injunctive relief in question were covered damages under the liability policies, *id*. at 843-44, 799 P.2d at 1280.

The distinction between remedial and prophylactic remedies as a basis for determining coverage has been acknowledged with approval in several other opinions. *See, e.g.*, <u>Energy-North Natural Gas, Inc. v. Century Indem. Co.</u>, 452 F.3d 44, 56 (1st Cir. 2006); <u>Aetna Cas. & Sur. Co. v. Kentucky</u>, 179 S.W.3d 830, 838-39 (Ky. 2005); <u>Aetna Ins. Co. v. Aaron</u>, 112 Md. App. 472, 487, 685 A.2d 858, 865 (1996); <u>Weyerhaeuser Co. v. Aetna Cas. & Sur. Co.</u>, 123 Wn.2d 891, 905, 874 P.2d 142, 150 (1994); <u>Boeing Co. v. Aetna Cas. & Sur. Co.</u>, 113 Wn.2d 869, 886, 784 P.2d 507, 516 (1990); <u>Johnson Controls, Inc. v. Employers Ins. of Wausau.</u>, 264 Wis.2d 60, 92-93, 665 N.W.2d 257, 274 (2003).

Notwithstanding the federal lawsuit's various references to seeking relief that would "remedy" past violations and harm to public health, the power companies acknowledge that the injunctive remedy sought by the federal lawsuit is "to force Cinergy to install equipment to contain any *further* excess emissions and allow the environment to recover." Appellants' Br. at 26 (emphasis added). The federal lawsuit is directed at preventing future public harm, not at obtaining control, mitigation, or compensation for past or existing environmentally hazardous emissions.

The responsibilities of AEGIS under its policies for "ultimate net loss," including the power companies' defense costs, is conditioned by the requirement that such loss be for damages because of bodily injury or property damage "*caused by* an OCCURRENCE."  Appellants' App'x. at 382, 409, 442 (emphasis added).  Under all three policies the term "occurrence" means "an accident, event, or continuous or repeated exposure to conditions."[11]  *Id.* at 386, 413, 447.  Due to this occurrence requirement, the policy thus applies only if damages claimed by the power companies, the costs associated with the installation of equipment to contain further excess emissions, constitute damages because of bodily injury or property damage *caused by* an accident, event, or exposure to conditions.  The clear and unmistakable import of the phrase "caused by" is that the accident, event, or exposure to conditions must have preceded the damages claimed— here, the costs of installing emission control equipment.

But what the power companies here claim to be covered, the installation costs for equipment to prevent future emissions, is not caused by the *happening* of an accident, event, or exposure to conditions but rather result from the *prevention* of such an occurrence.  We cannot read the policy requirement that covered damages result from the happening of an occurrence to mean that coverage extends to damages that result from the prevention of an occurrence.  Notwithstanding our preference to construe ambiguous insurance policy language strictly and against the insurer, we discern no ambiguity here that would permit the occurrence requirement reasonably to be understood to allow coverage for damages in the form of installation costs for government-mandated equipment intended to reduce future emissions of pollutants and to prevent future environmental harm.

As noted above, Indiana precedent holds that the undefined term "damages" in a comprehensive general liability policy "includes environmental cleanup and response costs."  Travelers Indem. Co., 715 N.E.2d at 934 (quoting Hartford v. Dana, 690 N.E.2d at 297-98).  Each of these cases, however, involve expenses related not to preventing emissions or discharges of environ-

---

[11] In the 1984-85 policies, but not the 1999-2000 policy, this definitional phrase is followed by the language: "*which result* in BODILY INJURY . . . or PROPERTY DAMAGE."  *Id.* at 386, 413 (emphasis added).  In contrast, the 1999-2000 policy prefaces the definitional phrase by "with respect to BODILY INJURY and PROPERTY DAMAGE" and adds the following words at the end of the definitional phrase: "neither expected nor intended from the standpoint of the INSURED."  *Id.* at 447.  These differences are of no consequence to our analysis.

mental hazards that may be produced in the future but to the cleanup costs for prior environmental damage or the containment costs to prevent release of existing hazardous substances. The apparently broad declaration in <u>Hartford v. Dana</u> that damages could include costs "to prevent further release of hazardous substances" must be construed in the context of the full sentence in which it appears: "The cost of containment as a *remedial* action taken to prevent further release of hazardous substances would be considered damages." 690 N.E.2d at 298 (emphasis added).

We hold that "ultimate net loss," as used in the AEGIS insurance policies at issue, does not impose upon AEGIS any responsibility to pay for sums that the power companies may become legally obligated to pay as "ultimate net loss" for the costs of installing government mandated equipment intended to reduce future emissions of pollutants and to prevent resulting future environmental harm. AEGIS is not thus responsible for the power companies' costs of defending against claims or suits seeking to impose such liability.

The power companies' motion for partial summary judgment seeks an order requiring AEGIS to pay all the defense costs the power companies incur in defending the federal lawsuit. The motion for partial summary judgment is not limited to seeking costs incurred only in the defense of any federal lawsuit claims seeking damages unrelated to equipment installation intended to reduce future emissions. The power companies make no argument addressing the apportionment of defense costs in the event the federal lawsuit seeks various relief, only some of which would constitute damages and defense costs covered by the AEGIS policies.[12] Because the power companies were not entitled to the relief sought in their motion for summary judgment, we decline to find error in the trial court's decision to deny the motion.

**Conclusion**

---

[12] Although the power companies argue that AEGIS is required to pay defense costs for potentially covered claims, this assertion does not address the apportionment of defense costs between covered and non-covered claims for relief in the federal lawsuit. Rather, when speaking of potentially covered claims, the power companies are referring to the AEGIS policies' separate obligation to provide defense costs, regardless whether the federal plaintiffs are ultimately successful. Appellants' Br. at 9-13; Appellants' Reply Br. at 20-25. We have addressed this issue *supra*, agreeing with the power companies.

16

In this interlocutory appeal, the power companies are challenging the denial of their motion for partial summary judgment, which sought an order directing AEGIS to pay as incurred the power companies' expenses in the defense of a federal lawsuit seeking primarily to compel the companies to install equipment to reduce future emissions of pollutants and to prevent resulting future environmental harm. Because the AEGIS insurance policies do not provide coverage for the costs of installing such equipment, the trial court did not err in denying partial summary judgment seeking to compel payment of all costs incurred by the power companies in defending all claims in the federal lawsuit. We affirm the trial court.

Shepard, C.J., and Sullivan, Boehm, and Rucker, JJ., concur.