**CINERGY CORPORATION, Duke Energy Indiana, Inc., and Duke Energy Ohio, Inc., Appellants–Defendants,**

v.

**ST. PAUL SURPLUS LINES INSURANCE COMPANY, et al., Appellees–Plaintiffs.**

No. 32A04–0810–CV–622.

Court of Appeals of Indiana.

Oct. 28, 2009.

George M. Plews, Donna C. Marron, John M. Ketcham, Plews Shadley Racher & Braun, Indianapolis, IN, William O. Harrington, William O. Harrington, P.C., Danville, IN, Eric Cavanaugh, Associate General Counsel, Duke Energy Corporation, Plainfield, IN, Attorneys for Appellants.

Jan M. Michaels, Steven Schulwolf, Michaels & May, P.C., Chicago, IL, Kenneth C. Newa, Plunkett Cooney, P.C., Detroit, MI, Bryce H. Bennett, Jr., James O. Giffin, Riley Bennett & Egloff, LLP, Indianapolis, IN, Charles W. Browning, Plunkett Cooney, P.C., Bloomfield Hills, MI, Attorneys for Appellees, St. Paul Surplus Lines Insurance Co., and Travelers Casualty and Surety Company.

Richard A. Smikle, Brian J. Paul, Ice Miller LLP, Indianapolis, IN, Howard B. Epstein, Theodore A. Keys, Sami B. Groff, Schulte Roth & Zabel LLP, New York, NY, Attorneys for Appellee, Associated Electric & Gas Insurance Services, Ltd.

Bruce L. Kamplain, Norris, Choplin & Schroeder, LLP, Indianapolis, IN, Michael R. Orlando, Cohn Baughman & Martin, Chicago, IL, Attorneys for Appellee Century Indemnity Company.

Lisa S. Brogan, Baker & McKenzie LLP, Chicago, IL, James M. Boyers, Blaire M. Henley, Wooden & McLaughlin LLP, Indianapolis, IN, Attorneys for Appellee Royal Indemnity Company n/k/a Arrowood Indemnity Company.

Bruce L. Kamplain, Norris, Choplin & Schroeder, LLP, Indianapolis, IN, Attorney for Appellee Continental Insurance Company.

John Trimble, Sonia Das, Lewis Wagner, LLP, Indianapolis, IN, Ilene M. Korey, Clausen Miller, P.C., Chicago, IL, Attorneys for Appellee Lexington Insurance Company Insurance Company of the State of Pennsylvania and National Union Fire Insurance Company of Pittsburgh, PA.

Mary K. Reeder, Riley Bennett & Egloff, LLP, Indianapolis, IN, Attorney for Appellee Great American Insurance Company of New York.

David A. Temple, Matthew J. Schafer, Drewry Simmons Vornehm, LLP, India-

napolis, IN, William H. Cohn, Cohn Baughman & Martin, Chicago, IL, Attorneys for Appellee Republic Insurance Company.

Laura S. Reed, Jeffrey B. Fecht, Riley Bennett & Egloff, LLP, Indianapolis, IN, Joseph A. Hinkhouse, Richard McDermott, Hinkhouse Williams Walsh LLP, Chicago, IL, Attorneys for Appellee Certain Lloyd's Underwriters.

Richard H. Riegner, Stewart & Irwin, P.C., Indianapolis, IN, Attorney for Appellee TIG Insurance Company f/k/a Transamerica Premier.

Bradford S. Moyer, Plunkett Cooney, P.C., Kalamazoo, MI, Attorney for Appellee TIG Insurance Company as Successor to International Insurance Company and International Surplus Lines Insurance Company.

## OPINION

MATHIAS, Judge.

Cinergy Corporation, Duke Energy Indiana Inc., and Duke Energy Ohio Inc. (collectively "Cinergy") appeal the Hendricks Superior Court's grant of summary judgment in favor of St. Paul Surplus Lines Insurance Co. ("St. Paul"), Travelers Casualty and Surety Co.,[1] and Associated Electric and Gas Insurance Services, Ltd. ("AEGIS") (collectively "the Insurers"),[2] and the trial court's determination that the Insurers have no obligation to defend, indemnify, or otherwise provide coverage to Cinergy in connection with Cinergy's alleged liability for violations of the Clean Air Act. Cinergy appeals and raises several issues, which we consolidate and restate as:

I. Whether the trial court appropriately interpreted our supreme court's decision in *Cinergy Corp. v. Associated Electric & Gas Insurance Services, Ltd.*, 865 N.E.2d 571 (Ind. 2007) in determining that the Insurers have no duty to defend or indemnify Cinergy in connection with Cinergy's alleged violations of the Clean Air Act;

II. Whether the trial court erred when it determined that Cinergy's claims are not covered under the Insurers' policies; and,

III. Whether the trial court should have postponed its coverage determination until the underlying federal lawsuit concerning Cinergy's alleged Clean Air Act violations was concluded.

Concluding that the trial court properly entered summary judgment in favor of the Insurers, we affirm.

## Facts and Procedural History

The Clean Air Act establishes a comprehensive program for controlling and improving the nation's air quality through both state and federal regulation. *Greenbaum v. U.S. Envtl. Prot. Agency*, 370 F.3d 527 (6th Cir.2004). In an effort to improve and control ambient air quality, Congress enacted the 1977 Amendments to the Clean Air Act. *State v. Costas*, 552 N.E.2d 459 (Ind.1990) (citing 42 U.S.C. § 7401 et seq.). In those amendments,

---

1. Formerly known as Aetna Casualty & Surety Co.

2. Pursuant to Indiana Appellate Rule 46(G), Certain Lloyd's Underwriters, TIG Insurance Company, Insurance Company for the State of Pennsylvania, National Union Fire Insurance Company of Pittsburg, PA, Lexington Insurance Company, Republic Insurance Company, Continental Insurance Company, Royal Indemnity Company k/n/a Arrowood Indemnity Company, and Century Indemnity Company joined in the submission of St. Paul's Appellees' Brief and AEGIS's Appellee's Brief.

Congress created the new source review program, which is a permitting program for new or modified, major, stationary sources of air pollution in nonattainment areas.[3] Under the program, any new project or modification to an existing project that would emit more than a threshold amount of a pollutant for which that region has not attained the National Ambient Air Quality Standards must apply for a permit to construct and operate that pollution source. The permit may only be granted if the project uses technology that will ensure "the lowest achievable emission rate" and obtains emissions reduction credits to offset the emissions that it will produce. *See Romoland Sch. Dist. v. Inland Empire Energy Ctr., LLC*, 548 F.3d 738, 740–41 (9th Cir.2008) (citing 42 U.S.C. §§ 7410(a), 7502(c), 7503(a)).

In 1999, the United States, three states, and two environmental organizations filed a lawsuit in federal court against Cinergy for alleged violations of the Clean Air Act (hereinafter referred to as "the underlying federal litigation."). The complaint alleges that Cinergy performed certain maintenance and repair projects at six power plants without obtaining the permits required under the Clean Air Act. Operation of the plants without installing additional air emissions containment equipment has caused increased emissions of harmful substances into the air. In the ongoing underlying federal litigation, the plaintiffs seek to compel Cinergy to install equipment to reduce future emissions of pollutants and to prevent resulting future environmental harm.

In October, 2000, the Insurers filed a declaratory judgment action in Hendricks

Superior Court for a determination of their coverage obligations under the insurance policies Cinergy carried on its power plants during the relevant time periods. Proceedings in this cause have resulted in several appeals to Indiana's appellate courts. The decisions important to the issues before us are *Cinergy Corp. v. Associated Elec. & Gas Ins. Servs., Ltd.*, 865 N.E.2d 571 (Ind.2007) (*"Cinergy I"*) and *Cinergy Corp. v. St. Paul Surplus Lines Ins. Co.*, 873 N.E.2d 105 (Ind.Ct.App.2007), *trans. denied* (*"Cinergy II"*).

In *Cinergy I*, Cinergy appealed the denial of its motion for partial summary judgment in which the company sought an order directing AEGIS to pay the company's expenses as incurred in the defense of the underlying federal litigation. Our supreme court held that the AEGIS policies do not provide coverage for damages "in the form of installation costs for government-mandated equipment intended to reduce future emissions of pollutants and to prevent future environmental harm." 865 N.E.2d at 582. Ultimately, the court concluded, "[b]ecause the AEGIS insurance policies do not provide coverage for the costs of installing such equipment, the trial court did not err in denying partial summary judgment seeking to compel payment of all costs incurred by [Cinergy] in defending all claims in the federal lawsuit." *Id.* at 583.

Approximately four months later, our court issued its opinion in *Cinergy II*. In that case, the trial court entered partial summary judgment to the Insurers after concluding that Cinergy failed to establish that there was a "potential occurrence" during the 1983–84 policy term at Ciner-

---

**3.** A nonattainment area is an air quality control region that has not met the National Ambient Air Quality Standards. The Clean Air Act requires states to submit a state implementation plan to the Environmental Protec-

tion Agency providing specific pollution control measures necessary for the attainment, maintenance, and enforcement of the National Ambient Air Quality Standards.

gy's Cayuga Plant. Our court affirmed after concluding that there was neither an actual or potential occurrence under the policy at issue, as that term was interpreted by our supreme court in *Cinergy I*. *Cinergy II*, 873 N.E.2d at 115.

After the *Cinergy I* and *Cinergy II* decisions issued, the Insurers moved for summary judgment seeking an order declaring that they have no obligation to defend or indemnify Cinergy for any of the claims being adjudicated in the underlying federal litigation. Cinergy filed a motion to postpone any indemnity determination until the claims in underlying federal litigation are resolved.

On May 15, 2008, the trial court denied Cinergy's motion to postpone. A hearing on the Insurers's motion for summary judgment was held on August 7, 2008. On September 23, 2008, the trial court issued the following order granting summary judgment in favor of the Insurers:

(a) [The Insurers] have no obligation to defend, indemnify or otherwise provide coverage to [Cinergy] in connection with [Cinergy's] liabilities for alleged violations of the Clean Air Act for operations related to the Cayuga, Gallagher, Wabash, Gibson, Beckjord, Miami Fort and J.M. Stuart sites. Specifically, [the Insurers] have no obligation to defend, indemnify or otherwise provide coverage to [Cinergy] in connection with the claims made in the underlying lawsuit, *United States v. Cinergy Corp.*, No. IP 99–1693–C–MS, or any related action concerning [Cinergy's] alleged violations of the Clean Air Act, including but not limited to any claims for fines or penalties and the matters alleged in Count III of the Counterclaims asserted in [Cinergy's] Answer;

(b) None of [Cinergy's] claims, including those related to the underlying lawsuit constitute damages because of bodily injury, personal injury or property damages caused by an occurrence, as required by [the Insurers'] policies;

(c) [Cinergy's] Counterclaims are dismissed with prejudice; and

(d) This Order and the Court's prior Orders in this action dated May 22, 2003 and May 31, 2006 dismiss all of [Cinergy's] claims for coverage under all of [the Insurers'] policies.

Appellant's App. p. 100. Cinergy now appeals. Additional facts will be provided as necessary.

### Standard of Review

Our standard of review for a trial court's grant of a motion for summary judgment is well settled.

A party is entitled to summary judgment if no material facts are in dispute and as the facts stand, under the law, the party is entitled to a judgment in its favor. Ind. Trial Rule 56(C) ("The judgment sought shall be rendered forthwith if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law"). When reviewing the propriety of a ruling on a motion for summary judgment, this Court applies the same standard as the trial court. Review is limited to those materials designated to the trial court. The Court accepts as true those facts alleged by the nonmoving party, construes the evidence in favor of the nonmoving party, and resolves all doubts against the moving party. Summary judgment is appropriate when the undisputed material evidence negates one element of a claim. *Estate of Mintz v. Conn. Gen. Life Ins. Co.*, 905 N.E.2d 994, 998 (Ind.2009) (internal citations omitted). Moreover, we observe that the construction of an insurance policy is a question of law for which sum-

mary judgment is particularly appropriate. *T.R. Bulger, Inc. v. Indiana Ins. Co.*, 901 N.E.2d 1110, 1114 (Ind.Ct.App.2009).

## I. The Insurance Policies

The terms of the insurance policies at issue in this appeal are substantially similar to the following quoted language from AEGIS's policy agreeing to indemnify Cinergy

> for any and all sums which the IN-SURED shall become legally obligated to pay as ULTIMATE NET LOSS ... for damages because of BODILY INJU-RY ... or PROPERTY DAMAGE caused by an OCCURRENCE.

Appellant's App. p. 1172. Similarly, the St. Paul Surplus Lines policy provides that it "shall only be liable hereunder for ultimate net loss as a result of any occurrence covered under Insuring Agreement I...." *Id.* at 272. Although the precise definition of "occurrence" varies between the policies, in general, the policies define occurrence as an accident, event, or continuous or repeated exposure to conditions which results in bodily injury or property damage. *See e.g.*, Appellant's App. pp. 1135, 1221.

## II. *Cinergy I*

On May 1, 2007, our supreme court handed down its decision in *Cinergy I*. In that case, Cinergy argued that AEGIS was required to pay its costs for defending the underlying federal litigation including defense costs for claims actually resulting in liability and for potentially covered claims. In response, AEGIS argued, in part, that Cinergy did not establish that the claims in the underlying federal litigation fell within its claim of "potentially covered." 865 N.E.2d at 576. Observing that the three AEGIS policies at issue impose essentially the same obligation, the court concluded, "[a]fter the self-insured retention amounts specified in the policies are satisfied, AE-GIS is responsible for expenses incurred by [Cinergy] in the investigation, negotiation, settlement, and defense of any claim or suit seeking damages because of or resulting in bodily injury or property damage with respect to any accident, event, or continuous or repeated exposure to conditions." *Id.* at 576–77. The court then noted, "[t]he essential controversy is thus whether the federal lawsuit against [Cinergy] is such a suit—one that seeks damages because of or resulting in bodily injury or property damage with respect to any accident, event, or continuous or repeated exposure to conditions." *Id.* at 577.

Because of the importance of the underlying federal litigation to the issues raised in *Cinergy I* (which is also of equal importance to the issues before us in this appeal), our supreme court summarized the "Prayer for Relief" in the federal complaint requesting that the federal district court take the following actions:

> (a) permanently enjoin the power companies from operating or constructing various power plants "except in accordance with the Clean Air Act and any applicable regulatory requirements" or the administrative consent order;
>
> (b) order the power companies "to remedy their past violations by, inter alia, requiring the Defendants to install, as appropriate, the best available control technology, the best available technology, or technology to achieve the lowest achievable emissions rate on each boiler unit" at various power plants, and "to take such other measures as are necessary to bring the Defendants' plants into compliance" with provisions of the Act and the State Implementation Plans, "including emission offsets, if necessary," and to otherwise comply with the Act;

(c) order the power companies "to take other appropriate actions to remedy, mitigate, and offset the harm to public health and the environment caused by the violations of the Clean Air Act";

(d) order the power companies "to apply for permits that are in conformity" with requirements of the Act and the State Implementation Plans;

(e) order the power companies "to conduct audits of their operations to determine if any additional modifications have occurred which would require them to meet" various statutory and regulatory requirements;

(f) assess "a civil penalty ... of up to $25,000 per day for each violation of the Clean Air Act and the applicable regulations, and $27,500 per day for each such violation on or after January 30, 1997";

(g) award costs of the action; and

(h) grant "such other relief as the Court deems just and proper."

*Id.* at 578 (record citation omitted).

AEGIS and Cinergy agreed that the "primary thrust of the federal lawsuit is to require the power companies to incur the costs of installing government-mandated equipment intended to reduce future emissions of pollutants and prevent future environmental harm." *Id.* at 579. Their principal disagreement was "whether the costs of installing such equipment fall within the policies' coverage for damages because of or resulting in bodily injury or property damage with respect to any accident, event, or continuous or repeated exposure to conditions." *Id.* AEGIS argued that such costs did not fall within the policies' coverage because the claims in the underlying federal litigation seek to force Cinergy " 'to comply with statutory requirements that it apply for certain permits before constructing projects at its facilities, and where necessary install modern pollution control technology as part of the construction.' " *Id.* at 581 (citing Appellee's Br. at 39–40).

After noting that the federal lawsuit is directed at preventing future public harm and not at obtaining control, mitigation, or compensation for past or existing environmentally hazardous emissions, our supreme court stated:

The responsibilities of AEGIS under its policies for "ultimate net loss," including the power companies' defense costs, is conditioned by the requirement that such loss be for damages because of bodily injury or property damage "caused by an OCCURRENCE." Under all three policies the term "occurrence" means "an accident, event, or continuous or repeated exposure to conditions." Due to this occurrence requirement, the policy thus applies only if damages claimed by the power companies, the costs associated with the installation of equipment to contain further excess emissions, constitute damages because of bodily injury or property damage caused by an accident, event, or exposure to conditions. The clear and unmistakable import of the phrase "caused by" is that the accident, event, or exposure to conditions must have preceded the damages claimed—here, the costs of installing emission control equipment.

But what the power companies here claim to be covered, the installation costs for equipment to prevent future emissions, is not caused by the happening of an accident, event, or exposure to conditions but rather result from the prevention of such an occurrence. We cannot read the policy requirement that covered damages result from the happening of an occurrence to mean that coverage extends to damages that result from the prevention of an occurrence. Notwithstanding our preference to con-

strue ambiguous insurance policy language strictly and against the insurer, we discern no ambiguity here that would permit the occurrence requirement reasonably to be understood to allow coverage for damages in the form of installation costs for government-mandated equipment intended to reduce future emissions of pollutants and to prevent future environmental harm.

*Id.* at 582 (record citation and footnote omitted).

Ultimately, our supreme court held that "ultimate net loss," as used in the AEGIS policies, "does not impose upon AEGIS any responsibility to pay for sums that the power companies may become legally obligated to pay as 'ultimate net loss' for the costs of installing government mandated equipment intended to reduce future emissions of pollutants and to prevent resulting future environmental harm. AEGIS is not thus responsible for [Cinergy's] costs of defending against claims or suits seeking to impose such liability." *Id.* at 583.

Shortly after the *Cinergy I* decision issued, our court considered whether the Insurers' policies provided coverage for Cinergy's alleged violations of the Clean Air Act during the 1984 modification of its Cayuga plant. After the plaintiffs in the underlying federal litigation withdrew their claim concerning the 1984 modification to the Cayuga plant, the Insurers moved for partial summary judgment, which the trial court granted. Noting our supreme court's discussion of the underlying federal litigation, our court affirmed and concluded that the trial court properly determined that there was no occurrence during the relevant policy term. *Cinergy II*, 873 N.E.2d at 115 (citing *Cinergy I*, 865 N.E.2d at 582) ("As the supreme court stated, 'the installation costs for equipment to prevent future emissions . . . is not caused by the happening of an . . . event

. . . but rather result from the prevention of such an occurrence.' ").

In its Appellant's Brief, Cinergy initially allocates a significant portion of its argument to its interpretation of the *Cinergy I* decision and its impact on the issues presented in this appeal. Cinergy argues that our supreme court did not intend "to foreclose any coverage for any relief sought by the" Plaintiffs in the underlying federal litigation. Appellant's Br. at 15. In support of that argument, Cinergy cites to the following language from *Cinergy I*:

[Cinergy's] motion for partial summary judgment seeks an order requiring AEGIS to pay all the defense costs the power companies incur in defending the federal lawsuit. The motion for partial summary judgment is not limited to seeking costs incurred only in the defense of any federal lawsuit claims seeking damages unrelated to equipment installation intended to reduce future emissions. The power companies make no argument addressing the apportionment of defense costs in the event the federal lawsuit seeks various relief, only some of which would constitute damages and defense costs covered by the AEGIS policies.

*Id.* at 583.

Cinergy made essentially the same argument in *Cinergy II*. Specifically, our court noted Cinergy's argument that

because the supreme court opinion leaves open the possibility that some of Cinergy's defense costs are covered by the insurer when the opinion notes that Cinergy made no argument addressing the apportionment of defense costs in the event some federal claims seek relief in the form of damages covered by the policies, the trial court's order in this case precluding any defense cost obligation is inconsistent with the supreme court's opinion.

873 N.E.2d at 114. Our court considered Cinergy's argument, and after a thorough review of the *Cinergy I* decision, concluded that there was neither an actual or potential occurrence under the terms of the Insurers' policies. *Id.* at 115. In the current appeal, we again consider Cinergy's arguments concerning the application of *Cinergy I* to the ultimate issue presented in this appeal: whether the relief demanded in the underlying federal litigation for Cinergy's alleged violations of the Clean Air Act is covered under the Insurers' policies.

### III. The Underlying Federal Litigation

In 2008, in the underlying federal litigation, a jury determined that Cinergy violated the Clean Air Act by failing to obtain required permits for four construction projects at its Wabash River Plant.[4] Shortly thereafter, during the remedy phase of the trial, Cinergy filed a motion for partial summary judgment arguing that the Clean Air Act "does not authorize remediation for past health and environmental effects and that even if it did, [the district court] should decline to exercise that authority[.]" *United States et al. v. Cinergy Corp. et al.*, 582 F.Supp.2d 1055, 1057 (S.D.Ind.2008). The district court disagreed and denied Cinergy's motion for partial summary judgment after concluding in part:

> [U]nless otherwise specified by statute, a court has the equitable authority to order a full and complete remedy for harms caused by a past violation, and in

doing so may go beyond what is necessary for compliance with the statute.

> Moreover, in this case an order requiring [Cinergy] to take actions that remedy, mitigate, and offset harms caused to the public and the environment by their past [Clean Air Act] violations would seem to give effect to the [Clean Air Act's] purpose "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare."

*Id.* at 1061 (citation omitted). Accordingly, the district court held that its equitable authority granted by section 113(b) of the Clean Air Act includes the authority to order relief "aimed at redressing the harms caused by [Cinergy's] established violations of the" Act. *Id.* ("In other words, this Court's equitable authority is not limited to providing prospective relief only.").

On May 29, 2009, after the briefs were filed in this appeal, the district court issued its order in the remedy phase for Cinergy's violations of the Clean Air Act at its Wabash River Plant and Beckjord Plant.[5] The court ordered Cinergy to 1) shut down units two, three, and five of the Wabash River Plant no later than September 30, 2009; 2) run units two, three, and five at a rate that does not exceed the Rosen baseline emissions until the time said units are shut down; and 3) permanently surrender sulfur dioxide emission allowances in an amount equal to the amount of sulfur dioxide emissions from

---

4. The district court ordered retrial on ten of the Plaintiffs' claims, and retrial took place in May 2009. AEGIS submitted the verdict forms as additional authority pursuant to Appellate Rule 48. Those claims apparently involved six projects at Cinergy's Beckjord, Gallagher, and Gibson plants. The jury found for the Plaintiffs on two of those projects: the pulverizers replacement projects at Gallagher units one and three.

5. Both Cinergy and Appellee AEGIS submitted the district court's order as additional authority pursuant to Appellate Rule 48. Also, in the remedy order, the district court noted that the court had previously concluded that Cinergy exceeded the limits established for particulate matter emissions at its Beckjord Plant by order dated September 28, 2007.

units two, three, and five from the period beginning on May 22, 2008, through shut down of those units on September 30, 2009. *United States et al. v. Cinergy Corp. et al.*, 618 F.Supp.2d 942, 957–58 (S.D.Ind.2009). With regard to the Beckjord plant, the court ordered Cinergy to pay a penalty in the amount of $687,500,[6] and to install a particulate matter continuous emissions monitor on Beckjord units one and two as soon as practical. *Id.*

## IV. Cinergy's Arguments

■ Cinergy acknowledges that in *Cinergy I*, our supreme court determined that the Insurers' policies do not provide coverage for the costs of installing equipment to reduce future emissions of pollutants. However, Cinergy argues that in the underlying federal litigation, the plaintiffs also seek "retrospective remedial measures aimed at remediating environmental harm already caused by unlawful air emissions." Appellant's Br. at 21. Cinergy argues costs for remedying unlawful air emissions are covered under the Insurers' policies. *See Cinergy I*, 865 N.E.2d at 583 ("Indiana precedent holds that the undefined term 'damages' in a comprehensive general liability policy 'includes environmental cleanup and response costs.'") (citations omitted).

In support of its argument, Cinergy notes the district court's decision in the underlying federal litigation that the court has the authority to order relief "aimed at redressing the harms caused by [Cinergy's] established violations of" the Clean Air Act.[7] *See Cinergy Corp. et al.*, 582 F.Supp.2d at 1062. Further, Cinergy asserts that surrendering emissions rights under the Clean Air Act is a remedial measure imposed to redress past harm to the environment.

With regard to the surrender of emissions allowances, during the remedy phase of the underlying federal litigation, the United States argued:

> additional future reductions in the same airshed are necessary to balance out the pollution that Cinergy never would have emitted if it had followed the law.... According to the Plaintiffs, "This ensures the best possible nexus between the violations and the remedy."

*Cinergy Corp. et al.*, 618 F.Supp.2d at 960. The district court ordered Cinergy to surrender the sulfur dioxide emissions allowances in an amount equal to the excess emissions from Wabash River Plant units two, three, and five, from May 22, 2008, the date the jury determined liability, to September 30, 2009, the date the court ordered the shutdown of those units to occur. The court concluded that this remedy would "confer an environmental benefit to the region" and "bears an equitable relationship to the degree of harm it is designed to remedy. Permanent surrender of $SO_2$ allowances confers an environmental benefit to the region that has been harmed by the over 350,000 tons of excess $SO_2$ emissions from Wabash River units 2, 3, and 5, over the past twenty years." *Id.* at 967. Finally, the court noted that sur-

---

6. To arrive at this amount, the district court multiplied $27,500 (the statutory maximum penalty per day violation) by twenty-five, which equaled the number of days Cinergy exceeded limits established for particulate matter emissions at Beckjord units one and two.

7. In support of its argument concerning the types of remedies the district court might order in the underlying federal litigation, Cinergy cites to other lawsuits brought against other Midwestern coal powered electric utilities. The litigation and remedies imposed in those cases are not relevant to the issues presented in this appeal. The record and recent district court orders establish the remedies sought by the Plaintiffs in the underlying federal litigation at issue here.

rendering the emissions allowances would mitigate, in part, the excess emissions from those units. *Id.*

Cinergy is resourceful in its characterization of the surrender of emissions allowances as a remedy for past harm. In fact, the quantification of the amount of emission allowances to be permanently surrendered is the product of the time period between a federal jury verdict of emissions violations and the date that the federal court ordered Cinergy to shut down and/or modify the power plants at issue in order to prospectively comply with the Clean Air Act. The thus-quantified reduction of future $SO_2$ emissions is therefore a cost of reducing future pollutants and environmental harm.

Our supreme court held in *Cinergy I* that remedies designed to prevent future environmental harm are not covered damages under the Insurers' policies. *See* 865 N.E.2d at 582 ("We cannot read the policy requirement that covered damages result from the happening of an occurrence to mean that coverage extends to damages that result of the prevention of an occurrence.... [W]e discern no ambiguity here that would permit the occurrence requirement reasonably to be understood to allow coverage for damages in the form of installation costs for government mandated equipment intended to reduce future emissions of pollutants and to prevent future environmental harm").

For the same reason that installation of equipment intended to reduce future emissions is not covered under the Insurers' policies, neither are the costs associated with Cinergy's surrender of emissions allowances. Court-ordered remedies imposed to prevent future emissions "are not caused by the happening of an accident, event, or exposure to conditions but rather result from the prevention of such an occurrence." *Id.* As our court noted in *Cinergy II*, "[t]he preventive measures the underlying lawsuits seeks were not 'caused by' the event in question. Thus, ... not only was there no actual occurrence bringing the claims against Cinergy within the terms of the policies, but also there was never a potential occurrence under the terms of the policies." 873 N.E.2d at 115.

■ Next, we turn to Cinergy's arguments regarding penalties and attorney fees. Cinergy argues that any penalties imposed in the underlying federal litigation are covered under the Insurers' policies,[8] and in support of that argument, cites to several federal decisions in which courts have held that penalties imposed under the Clean Water Act are civil, remedial penalties designed to compensate the government for past pollution. With regard to attorney fees, Cinergy asserts that any attorney fees awarded are considered compensatory damages and such damages are generally covered under general liability policies unless the policy excludes such coverage.

Cinergy's arguments on these issues were settled in *Cinergy I* and *Cinergy II*. There was no occurrence under the terms of the Insurers' policies, and therefore, any attorney fees or civil penalties imposed in the underlying federal litigation are not covered under the Insurers' policies.[9]

Because preventing future emissions and environmental harm is not an occurrence under the terms of the Insurers' policies, we conclude that the trial court

8. However, Cinergy does concede that some insurance policies implicated in this litigation expressly exclude fines or penalties.

9. Moreover, in dicta, our court has stated that penalties are not included within the ordinary meaning of damages. *See Hartford Accident & Indem. Co. v. Dana Corp.*, 690 N.E.2d 285, 298 (Ind.Ct.App.1997), *trans. denied.*

properly determined that the Insurers have no obligation to defend, indemnify or otherwise provide coverage to Cinergy for the claims being litigated in the underlying federal litigation concerning Cinergy's violations of the Clean Air Act.

## V. Postponement of the Trial Court's Indemnity Determination

Finally, Cinergy argues that the trial court should have postponed its indemnity determination pending dispositive developments in the underlying federal litigation. However, Cinergy has cited to no Indiana authority requiring a court to postpone a coverage determination until after the underlying liability trial has concluded.

As AEGIS notes in its Appellee's Brief, the trial court was asked to determine whether the Insurers were required to indemnify and defend Cinergy for the Plaintiffs' claims against Cinergy in the underlying federal litigation. The trial court was not required to determine the veracity of those claims, but only whether those claims were covered under the terms of the Insurers' policies.

As we noted above, the Plaintiffs allege that Cinergy committed numerous violations of the Clean Air Act. For those violations, the Plaintiffs seek closure of certain Cinergy plants, surrender of emissions allowances, installation of the best available control technology for the purpose of reducing future emissions, and penalties. Our courts have repeatedly held that the Plaintiffs' proposed remedies seeking the reduction of future emissions from Cinergy's plants and Cinergy's future compliance with the Clean Air Act are not covered under the Insurers' policies. So, even if Plaintiffs are successful in the underlying federal litigation, none of the remedies they have claimed create covered occurrences for Cinergy under relevant insurance policies.

The trial court entered summary judgment in this case with the benefit of the *Cinergy I* and *Cinergy II* decisions and evidence of the claims and relief sought in the underlying federal litigation. This was sufficient information for the trial court to make an informed and accurate coverage determination. For all of these reasons, we conclude that the trial court did not err when it denied Cinergy's motion to postpone its indemnity determination pending the outcome of the underlying federal litigation.

### Conclusion

There was neither an actual or potential occurrence to bring the claims against Cinergy in the underlying federal litigation within the terms of the Insurers' policies. Therefore, trial court properly concluded that the Insurers have no obligation to defend, indemnify or otherwise provide coverage to Cinergy in connection with Cinergy's liabilities for alleged violations of the Clean Air Act for operations related to the Cayuga, Gallagher, Wabash, Gibson, Beckjord, Miami Fort and J.M. Stuart sites. Accordingly, we affirm the trial court's grant of summary judgment in favor of the Insurers.

Affirmed.

DARDEN, J., and ROBB, J., concur.