# FOR PUBLICATION



ATTORNEYS FOR APPELLANTS:
CITY OF EVANSVILLE and
EVANSVILLE WATER AND SEWER
UTILITY:

**GEORGE M. PLEWS**
**DONNA C. MARRON**
**TONYA J. BOND**
**TODD G. RELUE**
Plews Shadley Racher & Braun, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES,
UNITED STATES GUARANTY
COMPANY, ST. PAUL FIRE and
MARINE INSURANCE COMPANY,
FIDELITY AND GUARANTY
INSURANCE COMPANY, and
FIDELITY GUARANTY INSURANCE
UNDERWRITERS, INC:

**BRYCE H. BENNETT, JR.**
**JEFFREY B. FECHT**
Riley Bennett & Egloff, LLP
Indianapolis, Indiana

**STEVEN SCHULWOLF**
**KATHRYN A 'HEARN**
Michaels & May, P.C.
Chicago, Illinois

ATTORNEYS FOR APPELLEES,
ARROWOOD SURPLUS LINES
INSURANCE COMPANY and
LANDMARK AMERICAN INSURANCE
COMPANY:

**GINNY L. PETERSON**
Kightlinger & Gray, LLP
Indianapolis, Indiana

**BRUCE D. CELEBREZZE**
**BRYAN S. CHAPMAN**
Sedgwick, LLP
Chicago, Illinois

# IN THE
# COURT OF APPEALS OF INDIANA

CITY OF EVANSVILLE and EVANSVILLE       )
WATER and SEWER UTILITY,                )
                                        )
        Appellants-Plaintiffs,          )
                                        )
            vs.                         )        No. 49A02-1104-PL-375
                                        )
UNITED STATES FIDELITY and GUARANTY     )
COMPANY, ET AL.,                        )
                                        )
        Appellees-Defendants.           )

---

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Michael D. Keele, Judge
Cause No. 49D07-0707-PL-27789

---

**March 23, 2012**

**OPINION - FOR PUBLICATION**

**BARNES, Judge**

## Case Summary

The City of Evansville ("the City") appeals the trial court's grant of summary

judgment in favor of United States Fidelity and Guaranty Company ("USF&G"), Fidelity

and Guaranty Insurance Company, Fidelity and Guaranty Insurance Underwriters, Inc.,

St. Paul Fire and Marine Insurance Company ("St. Paul"), Princeton Excess & Surplus

Lines Insurance Company, Hartford Casualty Insurance Company ("Hartford"), Twin

City Fire Insurance Company, Zurich American Insurance Company, American

Guarantee and Liability Insurance Company, Arrowood Surplus Lines Insurance

2

Company ("Arrowood"), and Landmark American Insurance Company ("Landmark") (collectively, "Insurers"). We affirm.[1]

## Issues

The City raises several issues, which we consolidate and restate as whether the trial court properly determined that the Insurers were entitled to summary judgment because the City was seeking coverage for projects to prevent future discharges of combined-sewer overflows rather than to remediate past discharges.

## Facts

Insurers sold primary and excess-layer general liability insurance policies to the City at various times. The policies, except for the Arrowood and Landmark policies, allegedly contain provisions regarding coverage for "'damages' that arise from 'bodily injury' or 'property damage' caused by an 'occurrence' during the policy period" and "'damages' that result from 'personal injury' during the policy period" subject to all the other definitions, terms, conditions, and exclusions in the policies. App. pp. 152-53, 698.[2] The Insurers, with the exception of Arrowood and Landmark, did not designate the relevant insurance policies. In their motion for summary judgment, the Insurers stated that, for purposes of the summary judgment motion, the policies at issue contained this language. Id. at 152-53. The City does not argue that the policies do not contain this

---

[1] Oral argument was held on February 15, 2012. We commend the attorneys for their advocacy.

[2] On appeal, the City also cites a copy of a Hartford insurance policy "that was originally filed by the City in the original proceeding in support of its motion for partial summary judgment [on a different issue]." Appellant's Br. p. 13 n.1 (citing App. p. 1253). However, that policy was not designated in the instant summary judgment proceedings, and as a result, we cannot consider that policy on appeal. A portion of that policy and a portion of the St. Paul policy appear to have been designated by the City as part of Emily Crisler's affidavit, and we may consider those portions of the policies on appeal. See App. p. 480.

3

language. However, because the Insurers did not actually designate the policies, we have not been provided with the contractual definitions of the relevant terms.[3]

The Arrowood and Landmark policies were designated and contained coverage for "ultimate net loss" because of "bodily injury," "property damage," "personal injury" or "advertising injury" caused by an "occurrence" during the policy period. Id. at 235, 279. The Arrowood and Landmark policies define "occurrence" with respect to "bodily injury" and "property damage" as "an accidental happening, including continuous and repeated exposure to substantially the same general harmful conditions which results in 'bodily injury' or 'property damage.'" Id. at 217, 261. The term "ultimate net loss" is defined as:

> the total sum which an insured becomes obligated to pay through either adjudication or compromise by reason of "bodily injury," "property damage," "personal injury," or "advertising injury," arising out of the insured's activities . . . . "Ultimate net loss" also includes:
>
> * * * * *
>
> b. Legal expenses, premiums to release attachments or appeal bonds, expenses for lawyers and investigators and other persons for defense, settlement or investigation of "claims" and "suits" which are paid under Coverage Parts II or III.

Id. at 219, 263.

The City's original sewer system was constructed approximately a century ago. The sewer system is a combined system, whereby "certain lines that transport sewage away from homes and businesses mix with stormwater collected by the City's storm

---

[3] In any insurance coverage dispute, copies of the entire policy ideally should be provided to the court.

4

drains." Id. at 437. Such combined sewer systems are designed such that, during periods of heavy rain, a combined sewer overflow ("CSO") will occur, and the overfill "exits the combined system through designated 'outfalls' and enters local streams, lakes, and rivers." Id. at 437-38. Thus, the City's system is designed to discharge diluted, but untreated sewage at certain times.

One of the City's outfalls is Bee Slough, which discharges into the Ohio River. Bee Slough consists of three sections. The first section of Bee Slough is enclosed and transitions into a concrete-lined section, which is approximately one mile long. Bee Slough then transitions back into an enclosed section. When the Ohio River is at a high water level, a levee gate is closed, and CSO discharges fill Bee Slough. The combined sewage "that is allowed to stand in the slough for days essentially undergoes the primary treatment process of gravity separation." Id. at 720. When the river recedes, the levee gate is opened, and "the liquid portion of the contained area drains to the river." Id. However, solid materials that have settled to the bottom of the concrete channel remain. The City uses a front-end loader and dump truck to remove the solids and clean the concrete channel annually.

The City has been issued National Pollution Discharge Elimination System ("NPDES") permits, which "set specific requirements and limitations on CSO discharges during wet weather conditions and prohibit CSO discharges during dry weather." Id. at 438. However, stricter requirements regarding CSO's have been enacted since the 1990's. The City, like other CSO communities, is required to develop a Long-Term Control Plan ("LTCP") to coordinate long-term sewer improvement projects, and the City

5

submitted a LTCP in 2002, but it was not approved. In 2005, the City sought reissuance of its NPDES permits, and the Environmental Protection Agency ("EPA") became involved in the negotiations. The EPA, Indiana Department of Environmental Management ("IDEM"), and the City entered into negotiations over a consent decree and the City's LTCP, but they could not agree on terms.

In June 2007, the City filed a complaint for declaratory judgment against some of the Insurers. In June 2009 and April 2010, the City filed motions for leave to amend its complaint to add additional insurer defendants, which the trial court granted. The City alleged that it had liability insurance policies with the Insurers for the relevant time periods that provided coverage for "the City's cost of remedial measures required by government to correct past harm caused by combined sewer overflows and to prevent further harm."[4] Id. at 698. The City sought "an award of its past and future Defense Costs and its past and future Indemnity Costs, up to policy limits, resulting from liability claims by government that overflows from the City's combined sewer overflow systems have harmed the environment." Id. at 699.

In June 2009, the United States and the State of Indiana, on behalf of the EPA and IDEM, filed a complaint against the City in federal district court, and they amended the complaint in December 2009. The Government alleged that the City had "unauthorized and illegal discharges of pollutants and other violations" of the Clean Water Act and its

---

[4] One of the City's experts, Dr. William Gonwa, stated, "remedial is past-looking, trying to clean up past contamination issues; whereas, the forward-looking projects are looking to prevent future contamination." App. p. 1155.

6

NPDES permits. Id. at 665. The Government claimed that the City had "discharged sewage and other harmful pollutants from the sewage collection systems that are part of its Publicly Owned Treatment Works ("POTW") onto public and private property and into navigable waters flowing through and around the City of Evansville, including but not limited to the Ohio River, Pigeon Creek, Bee Slough, and Carpentier Creek." Id. The Government sought: (1) a permanent injunction directing the City "to take all steps necessary to come into permanent and continuous compliance with all terms and conditions of its NPDES permits . . . ;" (2) an order permanently enjoining the City "from causing or contributing to pollution that is presenting an imminent and substantial endangerment to the health of persons in the service area of [the City's] POTW and ordering [the City] to take such other action as may be necessary to abate and mitigate such endangerment;" (3) "[a] permanent or temporary injunction ordering [the City] to mitigate the past environmental harm caused by its violations . . . ;" (4) a judgment of civil penalties for violations; and (5) an award of costs and disbursements to the United States and the State of Indiana. Id. at 683-84.

In October 2010, USF&G filed a motion for summary judgment alleging that the City's claim against the Insurers was not covered by the insurance policies because the claim was based on proposed improvements and upgrades to its sewer system, fines, and attorney fees, rather than remediation of past pollution.[5] USF&G's argument was based primarily on Cinergy Corp. v. Associated Elec. & Gas Ins. Services, Inc., 865 N.E.2d 571

---

[5] USF&G later filed a motion to substitute a corrected designation of evidence in support of its motion for summary judgment, which the trial court granted.

(Ind. 2007), ("Cinergy I"), and related opinions, Cinergy Corp. v. St. Paul Surplus Lines Ins., 873 N.E.2d 105 (Ind. Ct. App. 2007), ("Cinergy II"), trans. denied, and Cinergy Corp. v. St. Paul Surplus Lines Ins., 915 N.E.2d 524 (Ind. Ct. App. 2009), ("Cinergy III"), trans. denied.  The other defendant insurers, except for Arrowood and Landmark, filed motions to join in USF&G's motion for summary judgment.  Arrowood and Landmark filed a separate motion for summary judgment, in which they incorporated USF&G's arguments and designation of evidence and also designated their own insurance policies.

The City filed a response to the Insurers' motions for summary judgment and argued that a $15 million project to construct a dam and convert Bee Slough into a wetland was, at least in part, a remedial measure to allow present and future contaminants at Bee Slough to biodegrade naturally.  The Bee Slough project would result in some untreated sewage being diverted into the constructed wetland during substantial rainstorms, and the sewage would be allowed to naturally biodegrade in the wetland.  The City's designation of evidence included affidavits from: (1) Harry Lawson, Superintendent of Wastewater for the City of Evansville Water and Sewer Utility; (2) Dr. William Gonwa; and (3) Dr. Francis Magilligan.

The Insurers then filed reply briefs in support of their motions for summary judgment and designated additional evidence in support of their motions, including excerpts from Dr. Gonwa's deposition.  USF&G's also designated a news release issued by the City in November 2010 regarding a consent decree reached between the City and the Government and its expected approval by the Water and Sewer Utility Board.  See

8

App. p. 534. According to the news release, the consent decree required the City to develop a LTCP within two years, gave the City an additional nineteen and one-half to twenty-five years to complete the improvements to the sewer system, and required the City to pay a civil penalty of $490,000 "to resolve all claims and liability for alleged past violations." Id. at 535. However, the actual consent decree was not designated by the parties in their summary judgment submissions. At oral argument on appeal, the City asserted that the consent decree process was not finalized and that the EPA could still order the City to perform other activities, including removal of contaminated soil.

After a hearing on the motions for summary judgment, the City filed a motion for leave to file a surreply brief to address "USF&G's attacks on the City's expert affidavits." Id. at 1123. The City designated additional portions of Dr. Gonwa's deposition. Although the Insurers objected to the City's motion to file a surreply and designation of additional evidence, the trial court granted it.

On April 5, 2011, the trial court granted the Insurers' motions for summary judgment. The trial court concluded the insurance policies at issue did "not provide any coverage for Plaintiffs' alleged liability, including fines and penalties" as a result of the Government's action against the City "or any other related administrative or enforcement actions." Id. at 27. The trial court determined that our supreme court's decision in Cinergy I controlled and "[t]he amounts Evansville seeks in this action are for infrastructure improvement projects with the purpose of bringing Evansville's sewer system into legal compliance by reducing the amount of combined sewer overflow events ("CSOs") in the future." Id. The City's claims did not "involve 'damages' and/or

9

'ultimate net loss' on account of 'property damage,' 'bodily injury', or 'personal injury' caused by an 'occurrence,'" and the Insurers also did not owe the City a duty to defend. Id. at 28. The City now appeals.[6]

## Analysis

The City argues that the trial court improperly determined the Insurers were entitled to summary judgment because the City was seeking coverage for projects related to the prevention of future discharges rather than remediation of past discharges. Our standard of review for a trial court's grant of a motion for summary judgment is well settled. Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); Mangold ex rel. Mangold v. Ind. Dep't of Natural Res., 756 N.E.2d 970, 973 (Ind. 2001). All facts and reasonable inferences drawn from those facts are construed in favor of the nonmovant. Mangold, 756 N.E.2d at 973. Our review of a summary judgment motion is limited to those materials designated to the trial court. Id. We must carefully review a decision on summary judgment to ensure that a party was not improperly denied its day in court. Id. at 974.

Where a trial court enters findings of fact and conclusions thereon in granting a motion for summary judgment, as the trial court did in this case, they do not alter the nature of our review. Rice v. Strunk, 670 N.E.2d 1280, 1283 (Ind. 1996). In the

---

[6] During the trial court proceedings, at the City's request, the trial court issued an order declaring certain documents to be confidential. In this appeal, however, the City filed its appendix, which contains documents labeled confidential, but it failed to comply with the requirements of Indiana Administrative Rule 9(G)(4) and Indiana Trial Rule 5(G). Consequently, the City waived the confidentiality of the documents. See Recker v. Review Bd. of Ind. Dep't of Workforce Development, 958 N.E.2d 1136, 1138 n.4 (Ind. 2011).

10

summary judgment context, we are not bound by the trial court's specific findings of fact and conclusions thereon. Id. They merely aid our review by providing us with a statement of reasons for the trial court's actions. Id.

Generally, the interpretation of an insurance policy presents a question of law and is appropriate for summary judgment. Cinergy I, 865 N.E.2d at 574. Clear and unambiguous language in insurance policy contracts, like other contracts, should be given its plain and ordinary meaning. Id. Where the policy language is ambiguous, insurance contracts are to be construed strictly against the insurer and the language must be viewed from the standpoint of the insured. Id. "Ambiguous terms will be construed in favor of the insured, but for purposes of summary judgment, only if the ambiguity exists by reason of the language used and not because of extrinsic facts." Id.

The City's arguments on appeal concern our supreme court's opinion in Cinergy I and the related opinions. In Cinergy I, Associated Electric & Gas Insurance Services Limited ("AEGIS") and other insurance companies filed a complaint for declaratory judgment against Cinergy and other power companies insured by policies issued by the insurance companies. The declaratory judgment complaint sought to determine the insurance companies' obligations regarding a federal lawsuit filed against the power companies by the United States, three states, and several environmental organizations pursuant to the Clean Air Act. The federal lawsuit alleged that the power companies had failed to obtain permits and discharged excess emissions into the air. The power companies filed a motion for partial summary judgment in the declaratory judgment action seeking defense costs, but the trial court denied the motion.

11

On appeal, our supreme court analyzed the insurance policies and concluded that, "[a]fter the self-insured retention amounts specified in the policies are satisfied, AEGIS is responsible for expenses incurred by the power companies in the investigation, negotiation, settlement, and defense of any claim or suit seeking damages because of or resulting in bodily injury or property damage with respect to any accident, event, or continuous or repeated exposure to conditions." Id. at 576-77. "The essential controversy is thus whether the federal lawsuit against the power companies is such a suit–one that seeks damages because of or resulting in bodily injury or property damage with respect to any accident, event, or continuous or repeated exposure to conditions." Id. at 577. The court focused on a "distinction between remedial and prophylactic remedies as a basis for determining coverage. . . ." Id. at 581.

The court reviewed the federal complaint against the power companies and noted that the complaint's prayer for relief requested that the federal district court take the following action:

> (a) permanently enjoin the power companies from operating or constructing various power plants "except in accordance with the Clean Air Act and any applicable regulatory requirements" or the administrative consent order;
>
> (b) order the power companies "to remedy their past violations by, inter alia, requiring the Defendants to install, as appropriate, the best available control technology, the best available technology, or technology to achieve the lowest achievable emissions rate on each boiler unit" at various power plants, and "to take such other measures as are necessary to bring the Defendants' plants into compliance" with provisions of the Act and the State Implementation Plans, "including emission offsets, if necessary," and to otherwise comply with the Act;

12

(c) order the power companies "to take other appropriate actions to remedy, mitigate, and offset the harm to public health and the environment caused by the violations of the Clean Air Act";

(d) order the power companies "to apply for permits that are in conformity" with requirements of the Act and the State Implementation Plans;

(e) order the power companies "to conduct audits of their operations to determine if any additional modifications have occurred which would require them to meet" various statutory and regulatory requirements;

(f) assess "a civil penalty . . . of up to $25,000 per day for each violation of the Clean Air Act and the applicable regulations, and $27,500 per day for each such violation on or after January 30, 1997";

(g) award costs of the action; and

(h) grant "such other relief as the Court deems just and proper."

Id. at 578.

Despite language in the federal court lawsuit regarding the remediation of past pollution, our supreme court determined that "the primary thrust of the federal lawsuit is to require the power companies to incur the costs of installing government-mandated equipment intended to reduce future emissions of pollutants and prevent future environmental harm." Id. at 579. "Notwithstanding the federal lawsuit's various references to seeking relief that would 'remedy' past violations and harm to public health, the power companies acknowledge that the injunctive remedy sought by the federal lawsuit is 'to force Cinergy to install equipment to contain any further excess emissions

13

and allow the environment to recover.'" Id. at 582. The court concluded that the federal lawsuit was "directed at preventing future public harm, not at obtaining control, mitigation, or compensation for past or existing environmentally hazardous emissions." Id.

The Cinergy I court noted that the policies covered damages caused by an "occurrence" and that the power companies' claims did not qualify as an "occurrence" under the policies. Id. "[W]hat the power companies here claim to be covered, the installation costs for equipment to prevent future emissions, is not caused by the happening of an accident, event, or exposure to conditions but rather result from the prevention of such an occurrence." Id. The court discerned "no ambiguity here that would permit the occurrence requirement reasonably to be understood to allow coverage for damages in the form of installation costs for government-mandated equipment intended to reduce future emissions of pollutants and to prevent future environmental harm." Id. The court ultimately determined that the costs of installing government-mandated equipment intended to reduce future emissions and to prevent future environmental harm did not qualify as "ultimate net loss" under the policies. Id. at 583. As a result, the court held that the trial court properly granted partial summary judgment regarding costs incurred by the power companies in defending the federal lawsuit.

We reached similar conclusions in Cinergy II and Cinergy III. In Cinergy II, 873 N.E.2d 105, a federal lawsuit was filed against Cinergy alleging that, after certain maintenance and repair projects, Cinergy failed to install additional air emissions equipment, causing increased emissions of harmful substances. The claims regarding

14

emissions at a Cayuga plant were later dismissed from the federal lawsuit. The insurers filed a motion for partial summary judgment, arguing that they were not responsible for claims related to the Cayuga plant because there was no "occurrence." The trial court granted partial summary judgment to the insurers regarding Cinergy's claim for defense costs when it concluded that Cinergy's claim did not involve an "occurrence." Relying on Cinergy I, we concluded that, because the relevant claim was dismissed from the federal lawsuit, there was no occurrence to trigger the policies' coverage provisions. "[I]n order for the Insurers to bear any responsibility for payment of costs, there must first be a claim or claims arising out of an occurrence." Cinergy II, 873 N.E.2d at 115.

In Cinergy III, the insurers moved for summary judgment, claiming that they had "no obligation to defend or indemnify Cinergy for any of the claims being adjudicated in the underlying federal litigation" based on Cinergy I and Cinergy II. Cinergy III, 915 N.E.2d at 528. The trial court granted summary judgment, and we affirmed on appeal. We held that costs associated with Cinergy's federal-court ordered surrender of emissions allowances were "not caused by the happening of an accident, event, or exposure to conditions but rather result[ed] from the prevention of such an occurrence." Id. at 534. We further concluded that the insurance policies did not cover any civil penalties or attorney fees because there was "no occurrence" under the policies.[7] Id.

---

[7] We also noted that Cinergy conceded some of the policies involved "expressly exclude[d] fines or penalties," Cinergy III, 915 N.E.2d at 534 n.8, and that "penalties are not included within the ordinary meaning of damages." Cinergy III, 915 N.E.2d at 534 n.9 (citing Hartford Accident & Indem. Co. v. Dana Corp, 690 N.E.2d 285, 298 (Ind. Ct. App. 1997), trans. denied).

15

The parties also rely on Newnam Manufacturing, Inc. v. Transcontinental Ins. Co., 871 N.E.2d 396 (Ind. Ct. App. 2007), trans. denied. In the mid-1980's, a manufacturer modified equipment without the appropriate permits, and in 2003, IDEM brought an administrative action against the manufacturer based on the modification. The manufacturer eventually was granted summary judgment and sought reimbursement from its insurance carrier for its attorney fees. The trial court granted summary judgment to the insurance carrier on the attorney fees issue. On appeal, we relied upon Cinergy I to conclude that IDEM's action concerned reduction of future emissions, not a response to an "occurrence." Newnam, 871 N.E.2d at 403. The manufacturer argued that IDEM's action concerned remediation because "the only way to remediate air pollution is by limiting further emissions." Id. We rejected this argument based on Cinergy I. We further concluded that, because there had been no specific allegation that the manufacturer's excess emissions had contaminated another person's land or interfered with the enjoyment of such land, there was no coverage under the "personal injury" provision of the policy. Id. at 405. Ultimately, we determined that, "[b]ecause there was no potential for coverage under the policy, [the company's] lawsuit did not trigger [the insurer's] duty to defend." Id.

As in Cinergy I, the essential controversy here is whether the federal lawsuit against the City is a suit that seeks damages covered by the policies issued by the Insurers. The policies, except for the Arrowood and Landmark policies, apparently contain provisions regarding coverage for "'damages' that arise from 'bodily injury' or 'property damage' caused by an 'occurrence' during the policy period" and "'damages'

16

that result from 'personal injury' during the policy period" subject to all the other definitions, terms, conditions, and exclusions in the policies. App. pp. 152-53, 698. The Arrowood and Landmark policies contained coverage for "ultimate net loss" because of "bodily injury," "property damage," "personal injury" or "advertising injury" caused by an "occurrence" during the policy period. Id. at 235, 279. The Arrowood and Landmark policies define "occurrence" with respect to "bodily injury" and "property damage" as "an accidental happening, including continuous and repeated exposure to substantially the same general harmful conditions which results in 'bodily injury' or 'property damage.'" Id. at 217, 261.

As in Cinergy I, the policies here require an "occurrence," and under Cinergy I, projects to prevent pollution, rather than remediate past pollution, do not qualify as an occurrence.[8] The City argues that Cinergy I does not control here because it designated evidence that the Bee Slough project was at least partially remedial. The Insurers disagree, noting that the City failed to submit any documentation that it was ordered to correct past contamination and that the designated evidence fails to demonstrate a genuine issue as to whether the wetlands project is remedial.

In response to the Insurers' motion for summary judgment, the City relied on affidavits from Harry Lawson, the Superintendent of Wastewater for the City of

---

[8] The City also argues that the policies here are different because some of the policies "define 'property damage' to include a 'loss of use' of property that is not physically harmed" and some of the policies "provide separate 'personal injury' that is triggered by the 'offenses' of 'wrongful entry and/or 'the invasion of private occupancy of a premise." Appellant's Br. p. 34. The City bases its argument on definitions of "personal injury" and "property damage" in the Hartford and St. Paul policies. However, only a few pages of the policies were designated, and some of the pages designated are illegible. Moreover, regardless of this policy language, the City designated no evidence of a loss of use of property, personal injury, wrongful entry, or invasion of a premise.

17

Evansville Water and Sewer Utility, Dr. Gonwa, and Dr. Magilligan. Lawson submitted an affidavit claiming that the City was informed in 2005 that EPA and IDEM would be "seeking remedial measures for previous CSO and alleged SSO [Sanitary Sewer Overflow] discharges as part of an enforcement action brought under the CWA and related Indiana statutes." Id. at 439. Lawson's affidavit provided:

> The City has cleaned and disinfected Bee Slough, and has developed a plan in response to the USEPA's enforcement action to construct a dam and convert Bee Slough into a wetland at an estimated cost of $15,000,000.00. By constructing the dam and creating a wetland, the City will contain the CSO related contaminants at the Bee Slough site.

Id.

Dr. Gonwa's affidavit stated:

> The only remedy available to Evansville will involve a substantial investment in measures that will significantly reduce or eliminate CSO discharges. . . . Source control will eliminate the current CSO impacts to these two water bodies [Bee Slough and Pigeon Creek]. It will allow biodegradation and other natural process to improve sediment and water quality in Bee Slough over time. Source control may replace or eliminate the need for periodical removal and disposal by the City of CSO-impacted solids that accumulate in and along Bee Slough. There may, however, be further requirements to remove accumulated solids discharged with CSOs to Bee Slough.

Id. at 444. According to Dr. Gonwa, "[t]his wetland would contain the CSO pollutants, limit discharges to the Ohio River and other bodies of water, and allow for biodegradation and other natural processes to diffuse and remediate the pollutants." Id. Dr. Gonwa opined that "CSO control measures and sediment removal affecting Pigeon Creek and Bee Slough, that may be required of the City as a result of the U.S. EPA's and

18

the State of Indiana's enforcement activities, are remedial in nature or at a minimum have a substantial remedial component." Id. at 445. "The mandated removal of CSO-impacted sediment is directed solely at remediating and containing past contamination that resulted from the long-term impact of decades of CSO discharges." Id. Although Dr. Gonwa's affidavit discusses "mandated removal" of sediments, he admitted in his deposition, which was designated by the Insurers, that he was aware of no requirement that solids be removed from Bee Slough. In his deposition, Dr. Gonwa also testified that all of the projects identified in the LTCP contained "some remedial components." Id. at 1154-55.

Dr. Magilligan's affidavit provided that "sediment storage can . . . be considered a remediation strategy as well as mitigation strategy" and "most contaminants absorbed on sediment readily biodegrade and can be transformed to lower toxicities, and natural recovery processes, such as storing sediment on floodplains, serve to contain, destroy, or reduce the bioavailability of contaminated sediments." Id. at 452-53. However, Dr. Magilligan's affidavit was not specific to Bee Slough or Evansville; rather, it was based solely on general scientific propositions.

The question is whether there is a genuine issue of material fact regarding whether the Bee Slough conversion to a wetland is remedial, i.e., cures past pollution. Our review of the designated evidence shows that there is no genuine issue of material fact on this issue. In response to the Insurers' motions for summary judgment, the City designated no evidence that it was actually required to remediate any pollution or remove any polluted sediments. Although it claims that the Bee Slough wetland conversion is partially

19

remedial, the City presented no specific evidence that Bee Slough was contaminated or that it had been ordered to remediate Bee Slough. Dr. Gonwa's opinion that remedial sediment removal "may be required of the City" is pure speculation. App. p. 445. Dr. Magilligan's affidavit did not specifically address the situation at Bee Slough or Evansville. Further, Lawson's affidavit did not contain evidence that the City actually had been ordered to perform a cleanup of contaminants.

"[M]ere speculation cannot create questions of fact." Beatty v. LaFountaine, 896 N.E.2d 16, 20 (Ind. Ct. App. 2008), trans. denied. "Opinions expressing a mere possibility with regard to a hypothetical situation are insufficient to establish a genuine issue of material fact." Id. "'[G]uesses, supposition and conjecture are not sufficient to create a genuine issue of material fact to defeat summary judgment.'" Id. (quoting Midwestern Indem. Co. v. Sys. Builders, Inc., 801 N.E.2d 661, 666 (Ind. Ct. App. 2004), trans. denied). The designated evidence here amounts to mere speculation that the City may be required to perform remediation in the future, and such evidence is insufficient to demonstrate a genuine issue of material fact.

We concede that the federal court complaint does include a request that the City remediate pollution. The City designated evidence that the federal court lawsuit against it included demands for: (1) an order permanently enjoining the City "from causing or contributing to pollution that is presenting an imminent and substantial endangerment to the health of persons in the service area of [the City's] POTW and ordering [the City] to take such other action as may be necessary to abate and mitigate such endangerment;" and (2) "[a] permanent or temporary injunction ordering [the City] to mitigate the past

20

environmental harm caused by its violations . . . ." App. p. 684. However, the federal court complaint in Cinergy I also requested an order that the power companies "take other appropriate actions to remedy, mitigate, and offset the harm to public health and the environment caused by the violations of the Clean Air Act." Id. at 1058. Our supreme court held that, even though the federal court complaint included language requesting mitigation and a remedy of the Clean Air Act violations, the "primary thrust" of the lawsuit was a reduction of future emissions and pollution. Cinergy I, 865 N.E.2d at 579. Similarly, it is clear that the "primary thrust" of the federal court lawsuit against the City was the reduction of future CSO emissions.

Given the lack of genuine issues of material fact showing that the Bee Slough project is remedial, we conclude that Cinergy I governs this action and precludes the City's claim as a matter of law.[9] The City claims that Cinergy I is distinguishable because it concerned a Clean Air Act violation rather than a Clean Water Act violation, the federal complaint in Cinergy I contained general allegations of environmental harm rather than impacts in specific streams, and the relief sought is different. However, we

_____

[9] In its Appellant's Brief, the City also makes a brief argument differentiating between an insurance company's duty to defend and a duty to indemnify. See Appellant's Br. p. 27. Again, it is difficult to address this argument given the lack of designated insurance policies. In general, an insurance company's duty to defend is broader than its duty to indemnify. Newnam, 871 N.E.2d at 401. However, where an insurer's independent investigation of the facts underlying a complaint against its insured reveals a claim patently outside of the risks covered by the policy, the insurer may properly refuse to defend. Id. "We determine the insurer's duty to defend from the allegations contained within the complaint and from those facts known or ascertainable by the insurer after reasonable investigation." Id. If the pleadings reveal that a claim is clearly excluded under the policy, then no defense is required. Id. We addressed a similar argument in Newnam. Although the manufacturer argued that there was a possibility of coverage and, thus, there was a duty to defend, we disagreed. We concluded there was no duty to defend because the coverage sought related to future emissions rather than remediation of past pollution. Id. at 405. Similarly, here, there is no evidence that remediation of past pollution is required.

21

find those differences immaterial. The holding of Cinergy I is that prevention of future environmental harm, rather than remediation of past contamination, is not an "occurrence" under insurance policies, and the policies at issue here contain similar provisions. The differences between the instant action and Cinergy I do not impact that ultimate holding.[10] The trial court properly granted summary judgment to the Insurers based on Cinergy I.

## Conclusion

The trial court properly granted summary judgment to the Insurers. We affirm.

Affirmed.

KIRSCH, J., and BRADFORD, J., concur.

---

[10] Based on arguments at oral argument, we clarify that this opinion should not be interpreted to preclude the City from making a claim on the policies if it is later required to perform remedial actions under the Consent Decree or if third parties make claims of property damage or personal injuries as a result of sewage contamination by the City.