[Cite as *Bellaire corp. v. American Empire Surplus Lines*, 2018-Ohio-2517.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 106243**

---

**BELLAIRE CORPORATION**

PLAINTIFF-APPELLANT

vs.

**AMERICAN EMPIRE SURPLUS LINES
INSURANCE COMPANY, ET AL.**

DEFENDANTS-APPELLEES

---

**JUDGMENT:**
AFFIRMED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-13-816172

**BEFORE:** E.T. Gallagher, J., McCormack, P.J., and Laster Mays, J.

**RELEASED AND JOURNALIZED:** June 28, 2018

**ATTORNEYS FOR APPELLANT**

Gabrielle T. Kelly
David Sporar
Brouse McDowell, L.P.A.
600 Superior Avenue East, Suite 1600
Cleveland, Ohio 44114

Lucas M. Blower
Amanda M. Leffler
Brouse McDowell, L.P.A.
388 South Main Street, Suite 500
Akron, Ohio 44311


**ATTORNEYS FOR APPELLEES**

**For American Empire Surplus Lines Insurance Company**

Gregory A. Harrison
Dinsmore & Shohl, L.L.P.
255 East Fifth Street, Suite 1900
Cincinnati, Ohio 45202

Robert D. Anderle
Seeley, Savidge, Ebert & Gourash Co., L.P.A.
26600 Detroit Road, Suite 300
Cleveland, Ohio 44145

**For American Insurance Company**

David A. Schaefer
McCarthy, Lebit, Crystal & Liffman Co., L.P.A.
101 West Prospect Avenue
1800 Midland Building
Cleveland, Ohio 44115

Robert D. Anderle
Seeley, Savidge, Ebert & Gourash Co., L.P.A.
26600 Detroit Road, Suite 300
Cleveland, Ohio 44145
**ATTORNEYS FOR APPELLEES (continued)**

**For Federal Insurance Company**

Robert D. Anderle
Daniel F. Gourash
Seeley, Savidge, Ebert & Gourash Co., L.P.A.
26600 Detroit Road, Suite 300
Cleveland, Ohio 44145

Dipali Parikh
1100 Superior Avenue, 20th Floor
Cleveland, Ohio 44114

**For First State Insurance Company**

Karl A. Bekeny
Stephanie Rzepka
Kevin M. Young
Tucker Ellis, L.L.P.
950 Main Avenue, Suite 1100
Cleveland, Ohio 44113

Stacy S. Freel
Wayne S. Karbal
Karbal, Cohen, Economou, Silk & Dunn, L.L.C.
150 South Wacker Drive, Suite 1700
Chicago, Illinois 60606

Robert D. Anderle
Seeley, Savidge, Ebert & Gourash Co., L.P.A.
26600 Detroit Road, Suite 300
Cleveland, Ohio 44145

**ATTORNEYS FOR APPELLEES (continued)**

**For First State Underwriters Agency of
New England Reinsurance Corporation**

Stacy S. Freel
Wayne S. Karbal
Karbal, Cohen, Economou, Silk & Dunn, L.L.C.
150 South Wacker Drive, Suite 1700
Chicago, Illinois 60606

EILEEN T. GALLAGHER, J.:

{¶1} Plaintiff-appellant, Bellaire Corporation, appeals an order granting summary judgment in favor of defendants-appellees, Federal Insurance Company ("Federal"), American Empire Surplus Lines Company ("American"), and First State Underwriters Agency of New England Corporation ("First State") (collectively "the Insurers"). Bellaire claims the following two errors:

> 1. The trial court erred by granting summary judgment in favor of the appellee insurers and against Bellaire Corporation.

> 2. The trial court erred by failing to consider all arguments presented in the summary judgment.

{¶2} We find no merit to the appeal and affirm the trial court's judgment.

## I. Facts and Procedural History

{¶3} Bellaire is an Ohio corporation. Its corporate predecessor, The North American Coal Company ("NACCO"), operated a bituminous coal mine known as Conemaugh Mine No. 1 in west central Pennsylvania from 1968 to 1981. While the mine was in operation, it regularly filled with groundwater that needed to be pumped out and discharged. However, before discharging the water into local waterways, the water had to be treated because, as is common with mines, the water becomes acidic as it mixes with oxygen and elements in the mine. This phenomenon is known in the mining industry as "acid mine drainage."

{¶4} Ralph Shank, Bellaire's chief mining engineer, explained during his deposition that regulations, such as the Clean Steam Laws, have been governing mining operations and the treatment of acid mine drainage since the mid-1960s. (Shank depo. at 19, 46-48, describing Clean Stream Laws.) In accordance with those regulations, Bellaire obtained a mining permit in 1968 known as Permit No. 367M045 "Authorizing the Operation of a Coal Mine," to operate the Conemaugh Mine No. 1 ("the Permit"). Under the terms of the Permit, Bellaire is responsible

for acid mine drainage both while the mine is in operation and after its closure. (*See* the Permit marked as BEL567 attached to Federal's motion for summary judgment; Shank depo. 18, 56, 176-177; Kranz depo. 57-60.) Thus, Bellaire treated the acid mine drainage from the Conemaugh Mine No.1 at the nearby Hices Run Mine Drainage Treatment Plant, which was built for that purpose.

{¶5} When Bellaire closed the mine in December 1981, Bellaire and the Pennsylvania Department of Environmental Resources ("PADER") formulated a plan to seal the mine to prevent the discharge of acid water from the mine that could pollute adjoining areas. An internal memorandum suggests that personnel within Bellaire anticipated seepage of acidic water after the mine's closure and believed the Hices Run treatment plant should remain open to deal with that contingency. (Shank depo. 87-90.) The internal memorandum, dated May 21, 1982, states: "Current plans are to leave the plant intact. Plant may be needed in the future if NACCO[1] is required to treat mine water." (Shank depo. 87-90; Internal Memorandum dated May 21, 1982 titled "Conemaugh Mine No.1 Mine Closing Questionable Areas with Penelec."[2]) Despite the precautions set forth in the memorandum, Bellaire sealed the mine by filling its boreholes with cement and tore down the Hices Run treatment plant.

{¶6} In 1984, "red water" began flowing out of the Conemaugh mine onto nearby properties, and the property owners brought property damage claims against Bellaire. Federal, Bellaire's primary liability carrier, paid the claims in the mid-1980s. Following a lengthy investigation, PADER later determined that the "red water" was coming from the Conemaugh mine and demanded that Bellaire pump the mine and treat the polluted water.

---

[1] NACCO is Bellaire's parent corporation.

[2] Penelec refers to Pennsylvania Electric.

{¶7} Bellaire constructed the Hutchinson Hollow Treatment Plant, which opened in May 1990, to prevent additional flooding of acid mine drainage from the Conemaugh mine. The construction of the plant cost $2,172,061. (Complaint ¶ 50.) Bellaire alleges it incurred approximately $8 million in costs to operate the treatment plant in the ensuing years, and that it financed a $5 million trust to cover future operating costs. (Complaint ¶ 50.)

{¶8} Bellaire submitted claims to the Insurers seeking $15 million in damages, which it argues represents the cost of constructing and operating the Hutchinson Hollow Treatment Plant. The Insurers denied the claims. Consequently, in November 2013, Bellaire filed a complaint against the Insurers alleging breach of contract claim, for denying coverage, and a claim for declaratory judgment, seeking a declaration that the Insurers' policies covered Bellaire's claims.

{¶9} The Insurers filed motions for summary judgment, arguing, among other things, that Bellaire's damages did not result from an "occurrence" as defined by the policies because the treatment of acid mine drainage is a statutorily mandated, routine business expense that is prophylactic in nature. The Insurers also argued that the construction and operation of the Hutchinson Hollow Treatment Plant was not "property damage" covered under the policies, and that Bellaire failed to give timely notice of its claims.

{¶10} Additionally, American Empire and First State sought summary judgment based on the sudden and accidental pollution exclusion in their policies. Federal argued that Bellaire's claims were barred by the statute of limitations, and First State argued that Bellaire's claims were barred by the mining limitations endorsement and an absolute pollution exclusion in its policy.

{¶11} The trial court granted summary judgment in favor of the Insurers on Bellaire's claims. In a written opinion, the trial court declared that the Insurers were not obligated to indemnify Bellaire for the costs incurred in the construction and operation of the Hutchinson

Hollow Treatment Plant. The trial court concluded that Bellaire's damages claim did "not arise from an occurrence resulting in property damage for which Bellaire is legally liable." The trial court did not address the additional grounds for summary judgment raised in the briefs because the Insurers' argument that Bellaire's damages were not the result of a covered "occurrence" was dispositive. Bellaire now appeals the trial court's judgment.

## I.   Law and Analysis

### A.   Summary Judgment

{¶12} In the first assignment of error, Bellaire argues the trial court erred in granting summary judgment in favor of the Insurers. It contends the trial court misinterpreted controlling language in the applicable insurance policies.

{¶13} We review summary judgment rulings de novo, which means we review the trial court's judgment independently and without deference to the trial court's determinations while applying the same standard as that employed by the trial court. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996).

{¶14} Pursuant to Civ.R. 56(C), summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) the evidence submitted can only lead reasonable minds to a conclusion that is adverse to the nonmoving party. *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 369-370, 696 N.E.2d 201 (1998).

{¶15} "Insurance contracts are construed by the same rules used to construe contracts." *World Harvest Church v. Grange Mut. Cas. Co.*, 148 Ohio St.3d 11, 2016-Ohio-2913, 68 N.E.3d 738, ¶ 28. As with any contract, the intent of the parties is presumed to lie in the

language used by the parties in the policy unless the language is ambiguous. *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.*, 64 Ohio St.3d 657, 665, 597 N.E.2d 1096 (1992).

{¶16} Where the language is clear and unambiguous, the court applies the plain and ordinary meaning of the language to give effect to the parties' intent and does not apply the rules of contract construction or interpretation. *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 11. However, ambiguous provisions are construed strictly against the insurer and in favor of the insured, especially if they purport to limit or qualify coverage under the policy. *Westfield Ins. Co. v. Hunter*, 128 Ohio St.3d 540, 2011-Ohio-1818, 948 N.E.2d 931, ¶ 11.

{¶17} The Insurers issued primary, umbrella, and excess commercial liability policies to Bellaire. Although the language in the different policies is not identical, they all provide coverage to Bellaire for claims that Bellaire is legally obligated to pay because of "property damage" caused by "an occurrence." The policies also provide functionally equivalent definitions for the terms "occurrence" and "property damage." Thus, in this appeal we are asked to determine whether the language "all sums which the insured shall become legally obligated to pay as damages because of * * * property damage caused by an occurrence," or similar language used in the policies issued to Bellaire by the Insurers, includes coverage for the cost to build and operate the Hutchinson Hollow Treatment Plant.

{¶18} The Federal policies define an "occurrence" as:

an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

{¶19} The American policy similarly defined an "occurrence" as:

an accident, event, or happening including continuous or repeated exposure to condition which results, during the policy period, in * * * property damage * * * neither expected nor intended from the standpoint of the insured.

{¶20} First State agreed to provide coverage in excess of an umbrella policy issued by Integrity Insurance Company, which in turn, provided coverage in excess of the primary policy issued by Federal. The First State policy followed form to Integrity and is therefore bound by the language in the Integrity policies. The Integrity policies define an "occurrence" as

an accident, including continuous or repeated exposure to conditions, which result in * * * property damage * * * neither expected nor intended from the standpoint of the insured.

{¶21} Bellaire argues the trial court narrowly construed the terms "because of," "arising out of," or "on account of," and that this error "effectively re-wrote the policies" to exclude coverage. (Appellant's brief at 14.) According to Bellaire, in order to find "no occurrence," the Insurers had to prove that Bellaire intended or expected the migration of acid mine drainage onto the neighboring properties. And because there is no evidence that Bellaire expected or intended acid mine drainage to flood the neighboring properties, there is coverage under the policies.

{¶22} Acid mine drainage is a common occurrence in mining, which is why the Permit requires Bellaire to manage the acid mine drainage both while the mine was operating and after it was closed. (Kranz depo. 57-60; Shank depo. 18, 56.) Bellaire knew it was responsible for preventing the escape of acid mine drainage if the seal were to fail. Being hopeful that the seal would function does not mean the migration of acid mine drainage from the mine was unforeseeable or unexpected.

{¶23} Indeed, Shank admitted in an affidavit submitted in connection with litigation in another case that Bellaire "remains responsible for pumping and treating water from the mine."

(Shank depo. 176-177.) And Bruce Krantz, Bellaire's environmental coordinator and director of environmental affairs from 1977 to 1987, testified at deposition that personnel at Bellaire knew there could be "seepage of acid mine water from the mine after it's closed." (Krantz depo. 56.) In fact, Bellaire continued to monitor the mine pool elevation after the mine was closed before any water ever escaped the mine. (Shank depo. 94-95; 99-101, 104-107, 112-113, 143.) Hence, Bellaire's claim that it could not have expected the escape of acid mine drainage is not supported by the record. The costs of building and operating the Hutchinson Hollow Treatment Plant were incurred pursuant to an ongoing obligation under the Permit rather than to remediate past property damage claims. Therefore, the flooding of acid mine drainage that necessitated the construction of the Hutchinson Hollow Treatment Plant was not an "occurrence" as defined by the policies.

{¶24} Bellaire nevertheless argues that the costs to construct and operate the Hutchinson Hollow Treatment Plant constitute damages Bellaire is legally obligated to pay "because of" or "on account of" property damage. Bellaire asserts that the Insurers' policies "don't just cover 'property damage,' they cover all of Bellaire's liability arising from, because of, or on account of property damage." (Appellant's brief at 14.) In other words, Bellaire contends the policies provide coverage not only for property damage, but also for consequential damages resulting from property damage.

{¶25} The Insurers argue that the cost to build and operate the Hutchinson Hollow Treatment Plant are not damages, but rather routine business expenses that Bellaire is obligated to pay under the Permit. They further assert that the Hutchinson treatment plant was not built to remediate past contamination or property damage that occurred during the policy periods. The Insurers argue the plant was built to prevent future harm, which is not covered under the policies.

{¶26} Routine business expenses differ from damages caused by an occurrence in that business expenses are expected and damages caused by an occurrence are not. *See, e.g., Westfield Ins. Co. v. Coastal Group, Inc.*, 9th Dist. Lorain No. 05CA008664, 2006-Ohio-153, ¶ 11-13 (delay in repairing faulty workmanship was not an "occurrence," but was a routine business expense).

{¶27} As previously explained, the flooding of acid mine drainage after the Conemaugh mine was closed was not unexpected. The Permit specifically requires Bellaire to manage flooding after the mine was closed because such flooding is known to occur. Moreover, Krantz testified that managing acid mine drainage is an "ongoing expense * * * during active mine operations" and that Bellaire allocated "an annual budget" for that expense. (Krantz depo. at 60.) Moreover, Bellaire kept a reserve on its books to cover the cost of the mine's obligations after it was closed. (Krantz depo. 97.) Therefore, the cost of dealing with acid mine drainage is part of the cost of doing business in the mining industry.

{¶28} Furthermore, costs incurred to prevent future harm are generally not covered by insurance. Courts have held that prophylactic costs incurred to prevent future harm are "not caused by the happening of an accident, event, or repeated exposure to conditions but rather result from the prevention of such an occurrence." *Cinergy Corp. v. Assoc. Elec. & Gas Ins. Servs. Ltd.*, 865 N.E.2d 571, 583 (Ind.2007)*; see also Evansville v United States Fid. & Guar. Co.*, 965 N.E. 2d 92, 101 (Ind.App.2012).

{¶29} In *Cinergy*, several power companies incurred defense costs in the course of a federal environmental lawsuit aimed at forcing the companies to install equipment for the purpose of preventing pollution. The power companies asserted that the cost of replacing air scrubbers, among other things, were "damages" within the meaning of the applicable insurance

policy because the federal complaint alleged that the companies' prior conduct caused extensive damage to human health and welfare, to the environment, and to historic buildings. The federal lawsuit also sought to impose on the power companies "'the cost of government mandated injunctive remedies to remediate or contain further environmental harm.'" *Id*. at 579, quoting the power companies' brief.

{¶30} The policy at issue in *Cinergy* contained language similar to those at issue in this case. Under the relevant policy, the insurance carrier was responsible for damages because of bodily injury or property damage "'caused by an occurrence.'" *Id*., quoting applicable policy. The term "occurrence" was defined as "an accident, event, or continuous or related exposure to conditions." *Id*., quoting applicable policy. The *Cinergy* court interpreted this language to mean that due to the occurrence requirement, "the policy * * * applies only if damages claimed by the power companies, the costs associated with the installation of equipment to contain further excess emissions, constitute damages because of * * * property damage *caused by* an accident, event, or exposure to conditions." (Emphasis sic.) *Id*. More specifically, the court explained:

> The clear and unmistakable import of the phrase "caused by" is that the accident, event, or exposure to conditions must have preceded the damages claimed — here, the costs of installing emission control equipment.

*Id*.

{¶31} In finding that the power companies' claims were not covered under the relevant policy, the court observed that although the federal lawsuit made reference to seeking relief for past violations, "the primary thrust of the federal lawsuit [wa]s to require the power companies to incur the costs of installing government-mandated equipment intended to reduce future emissions of pollutants and prevent future environmental harm." *Id*. at 579. In other words, the federal

lawsuit was "directed at preventing future public harm, not at obtaining control, mitigation, or compensation for past or existing environmentally hazardous emissions." *Id*. at 582.

**{¶32}** Similarly, in *Evansville* the federal government and state of Indiana brought an action against the city of Evansville, alleging that its antiquated storm and sewer system had resulted in the illegal discharge of pollutants in local waterways. As a result of that litigation, Evansville was required to update its sewer system in order to bring it into compliance with federal and state permits. Evansville claimed the costs to update its system were covered by policies issued by its insurers because the lawsuit against it included claims "to correct past harm caused by sewer overflows" as well as the prevention of future harm.

**{¶33}** Again, the relevant policies defined the term "occurrence" with respect to property damage as "an accidental happening, including continuous or repeated exposure to substantially the same general harmful conditions, which results in * * * property damage." In finding that Evansville's claims were not covered under the policy, the court explained that although the federal complaint included a request to remediate past pollution, "the 'primary thrust'" of the federal complaint was the prevention of future environmental harm. *Id*. at 103, quoting *Cinergy,* 865 N.E.2d, at 579; *see also A.Y. McDonald v. Ins. Co. of N. Am.*, 475 N.W.2d 607 (1991) (while response costs for preventative measures employed after pollution has taken place are incurred "because of property damage," costs incurred to pay for preventive measures taken in advance of pollution are not incurred "because of property damage").

**{¶34}** There is no evidence in the record demonstrating that the Hutchinson Hollow Treatment Plant was required to resolve the property damage claims of neighboring third-parties. In fact, the third-party property damage claims were settled before the Hutchinson Hollow Treatment Plant was built. (Krantz depo. at 91; Shank depo. 204.) Therefore, the construction

and operation of the Hutchinson Hollow Treatment Plant was, and is, a preventive measure aimed at preventing future property damage claims and does not qualify as damages caused by an occurrence.

{¶35} We, therefore, agree with the trial court's conclusion that the Insurers were not obligated to indemnify Bellaire for the costs incurred in the construction and operation of the Hutchinson Hollow Treatment Plant.

{¶36} The first assignment of error is overruled.

## B.   Other Arguments

{¶37} In the second assignment of error, Bellaire argues the trial court erred in failing to consider the other arguments raised in the Insurers' motions for summary judgment.    It argues the trial court failed to "consider all matters it was required to consider under Civil Rule 56." (Appellant's brief at 20.)

{¶38} Although the Insurers raised alternative arguments in support of summary judgment in their favor, the trial court did not address these additional arguments because it found the Insurers' argument that Bellaire's damages were not the result of a covered "occurrence" was dispositive.   Since we agree with the trial court that Bellaire's claim for damages were not caused by a covered "occurrence," the other possible grounds for awarding summary judgment to the Insurers need not be considered and are moot.

{¶39} Therefore, the second assignment of error is overruled.

{¶40} Judgment affirmed.

It is ordered that appellees recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


EILEEN T. GALLAGHER, JUDGE

TIM McCORMACK, P.J., and
ANITA LASTER MAYS, J., CONCUR